SALE, ACTING COMMISSIONER, IMMIGRATION
AND NATURALIZATION SERVICE, ET AL. *v.*
HAITIAN CENTERS COUNCIL, INC., ET AL.

No. 92–344.   Argued March 2, 1993—Decided June 21, 1993

156

STEVENS, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and WHITE, O'CONNOR, SCALIA, KENNEDY, SOUTER, and THOMAS, JJ., joined. BLACKMUN, J., filed a dissenting opinion, *post*, p. 188.

*Deputy Solicitor General Mahoney* argued the cause for petitioners. With her on the briefs were *Solicitor General Starr, Assistant Attorney General Gerson, Paul T. Cappuccio, Edwin S. Kneedler, Michael Jay Singer,* and *Edwin D. Williamson.*

*Harold Hongju Koh* argued the cause for respondents. With him on the brief were *Drew S. Days III, Geoffrey C. Hazard, Jr., Paul W. Kahn, Michael Ratner, Cyrus R. Vance, Joseph Tringali, Lucas Guttentag, Judy Rabinovitz,* and *Robert Rubin.**

---

*\*William W. Chip, Timothy J. Cooney,* and *Alan C. Nelson* filed a brief for the Federation for American Immigration Reform as *amicus curiae* urging reversal.

Briefs of *amici curiae* urging affirmance were filed for the American Immigration Lawyers Association et al. by *Lory D. Rosenberg;* for the American Jewish Committee et al. by *David Martin, Samuel Rabinove,* and *Steven M. Freeman;* for Amnesty International et al. by *Bartram Brown* and *Paul Hoffman;* for the Association of the Bar of the City of New York by *Michael Lesch, John D. Feerick, Sidney S. Rosdeitcher,* and *Robert P. Lewis;* for Human Rights Watch by *Kenneth Roth, Karen Musalo,* and *Stephen L. Kass;* for the International Human Rights Law Group by *William T. Lake, Carol F. Lee, W. Hardy Callcott, Steven*

JUSTICE STEVENS delivered the opinion of the Court.

The President has directed the Coast Guard to intercept vessels illegally transporting passengers from Haiti to the United States and to return those passengers to Haiti without first determining whether they may qualify as refugees. The question presented in this case is whether such forced repatriation, "authorized to be undertaken only beyond the territorial sea of the United States,"[1] violates § 243(h)(1) of the Immigration and Nationality Act of 1952 (INA or Act).[2]

M. Schneebaum, and Janelle M. Diller; for the Lawyers Committee for Human Rights by Arthur C. Helton, William G. O'Neill, O. Thomas Johnson, Jr., Andrew I. Schoenholtz, and Carlos M. Vasquez; for the National Association for the Advancement of Colored People et al. by Wade J. Henderson, Laurel Pyke Mason, and Luther Zeigler; for the Office of the United Nations High Commissioner for Refugees by Joseph R. Guerra, Julian Fleet, and Ralph G. Steinhardt; and for Senator Edward M. Kennedy et al. by Joshua R. Floum and Deborah E. Anker.

Briefs of amici curiae were filed for the Haitian Service Organizations et al. by Terry Helbush; and for Nicholas deB. Katzenbach et al. by Michael W. McConnell.

[1] This language appears in both Executive Order No. 12324, 3 CFR 181 (1981–1983 Comp.), issued by President Reagan, and Executive Order No. 12807, 57 Fed. Reg. 21133 (1992), issued by President Bush.

[2] Title 8 U. S. C. § 1253(h) (1988 ed. and Supp. IV), as amended by § 203(e) of the Refugee Act of 1980, Pub. L. 96–212, 94 Stat. 107. Section 243(h)(1) provides:

"(h) Withholding of deportation or return. (1) The Attorney General shall not deport or return any alien (other than an alien described in section 1251(a)(4)(D) of this title) to a country if the Attorney General determines that such alien's life or freedom would be threatened in such country on account of race, religion, nationality, membership in a particular social group, or political opinion."

Section 243(h)(2), 8 U. S. C. § 1253(h)(2), provides, in part:

"(2) Paragraph (1) shall not apply to any alien if the Attorney General determines that—

.          .          .          .          .

"(D) there are reasonable grounds for regarding the alien as a danger to the security of the United States."

Before its amendment in 1965, § 243(h), 66 Stat. 214, read as follows:

"The Attorney General is authorized to withhold deportation of any alien within the United States to any country in which in his opinion the alien

We hold that neither §243(h) nor Article 33 of the United Nations Protocol Relating to the Status of Refugees[3] applies to action taken by the Coast Guard on the high seas.

## I

Aliens residing illegally in the United States are subject to deportation after a formal hearing.[4] Aliens arriving at the border, or those who are temporarily paroled into the country, are subject to an exclusion hearing, the less formal process by which they, too, may eventually be removed from the United States.[5] In either a deportation or exclusion proceeding the alien may seek asylum as a political refugee for whom removal to a particular country may threaten his life or freedom. Requests that the Attorney General grant asylum or withhold deportation to a particular country are typically, but not necessarily, advanced as parallel claims in either a deportation or an exclusion proceeding.[6] When an alien proves that he is a "refugee," the Attorney General has discretion to grant him asylum pursuant to §208 of the Act. If the proof shows that it is more likely than not that the alien's life or freedom would be threatened in a particular country because of his political or religious beliefs, under §243(h) the Attorney General must not send him to that

would be subject to physical persecution on account of race, religion, or political opinion and for such period of time as he deems to be necessary for such reason." 8 U. S. C. § 1253(h) (1964 ed., Supp. IV); see also *INS* v. *Stevic*, 467 U. S. 407, 414, n. 6 (1984).

[3] Jan. 31, 1967, 19 U. S. T. 6223, T. I. A. S. No. 6577.

[4] 8 U. S. C. § 1252 (1988 ed. and Supp. IV).

[5] 8 U. S. C. § 1226. Although such aliens are located within the United States, the INA (in its use of the term exclusion) treats them as though they had never been admitted; § 1226(a), for example, says that the special inquiry officer shall determine "whether an arriving alien . . . shall be allowed to enter or shall be excluded and deported." Aliens subject to either deportation or exclusion are eventually subjected to a physical act referred to as "deportation," but we shall refer, as immigration law generally refers, to the former as "deportables" and the latter as "excludables."

[6] See *INS* v. *Stevic*, 467 U. S., at 423, n. 18.

country.[7]  The INA offers these statutory protections only to aliens who reside in or have arrived at the border of the United States.  For 12 years, in one form or another, the interdiction program challenged here has prevented Haitians such as respondents from reaching our shores and invoking those protections.

On September 23, 1981, the United States and the Republic of Haiti entered into an agreement authorizing the United States Coast Guard to intercept vessels engaged in the illegal transportation of undocumented aliens to our shores. While the parties agreed to prosecute "illegal traffickers," the Haitian Government also guaranteed that its repatriated citizens would not be punished for their illegal departure.[8] The agreement also established that the United States Government would not return any passengers "whom the United States authorities determine[d] to qualify for refugee status."  App. 382.

On September 29, 1981, President Reagan issued a proclamation in which he characterized "the continuing illegal migration by sea of large numbers of undocumented aliens into the southeastern United States" as "a serious national problem detrimental to the interests of the United States." Presidential Proclamation No. 4865, 3 CFR 50–51 (1981–1983 Comp.).  He therefore suspended the entry of undocumented aliens from the high seas and ordered the Coast Guard to intercept vessels carrying such aliens and to return them to their point of origin.  His Executive Order expressly "provided, however, that no person who is a refu-

---

[7] *Id.*, at 424–425, 426, n. 20.

[8] As a part of that agreement, "the Secretary of State obtained an assurance from the Haitian Government that interdicted Haitians would 'not be subject to prosecution for illegal departure.'  See Agreement on Migrants—Interdiction, Sept. 23, 1981, United States-Haiti, 33 U. S. T. 3559, 3560, T. I. A. S. No. 10241."  *Department of State* v. *Ray,* 502 U. S. 164, 167–168 (1991).

gee will be returned without his consent." Exec. Order No. 12324, 3 CFR § 2(c)(3), p. 181 (1981–1983 Comp.).[9]

In the ensuing decade, the Coast Guard interdicted approximately 25,000 Haitian migrants.[10] After interviews conducted on board Coast Guard cutters, aliens who were identified as economic migrants were "screened out" and promptly repatriated. Those who made a credible showing of political refugee status were "screened in" and trans-

---

[9] That proviso reflected an opinion of the Office of Legal Counsel that Article 33 of the United Nations Convention Relating to the Status of Refugees imposed some procedural obligations on the United States with respect to refugees outside United States territory. That opinion was later withdrawn after consideration was given to the contrary views expressed by the legal adviser to the State Department. See App. 202–230.

[10] *Id.*, at 231. In 1985 the District Court for the District of Columbia upheld the interdiction program, specifically finding that § 243(h) provided relief only to Haitians in the United States. *Haitian Refugee Center, Inc.* v. *Gracey*, 600 F. Supp. 1396, 1406. On appeal from that holding, the Court of Appeals noted that "over 78 vessels carrying more than 1800 Haitians have been interdicted. The government states that it has interviewed all interdicted Haitians and none has presented a bona fide claim to refugee status. Accordingly, to date all interdictees have been returned to Haiti." *Haitian Refugee Center* v. *Gracey*, 257 U. S. App. D. C. 367, 370, 809 F. 2d 794, 797 (1987). The Court affirmed the judgment of the District Court on the ground that the plaintiffs in that case did not have standing, but in a separate opinion Judge Edwards agreed with the District Court on the merits. He concluded that neither the United Nations Protocol nor § 243(h) was "intended to govern parties' conduct outside of their national borders.

. . . . .

"The other best evidence of the meaning of the Protocol may be found in the United States' understanding of it at the time of accession. There can be no doubt that the Executive and the Senate decisions to adhere were made in the belief that the Protocol worked no substantive change in existing immigration law. At that time '[t]he relief authorized by § 243(h) [8 U. S. C. § 1253(h)] was not . . . available to aliens at the border seeking refuge in the United States due to persecution.'" *Id.*, at 413–414, 809 F. 2d, at 840–841 (opinion concurring in part and dissenting in part) (footnotes omitted). See *INS* v. *Stevic,* 467 U. S., at 415.

ported to the United States to file formal applications for asylum. App. 231.[11]

On September 30, 1991, a group of military leaders displaced the government of Jean Bertrand Aristide, the first democratically elected president in Haitian history. As the District Court stated in an uncontested finding of fact, since the military coup "hundreds of Haitians have been killed, tortured, detained without a warrant, or subjected to violence and the destruction of their property because of their political beliefs. Thousands have been forced into hiding." App. to Pet. for Cert. 144a. Following the coup the Coast Guard suspended repatriations for a period of several weeks, and the United States imposed economic sanctions on Haiti.

On November 18, 1991, the Coast Guard announced that it would resume the program of interdiction and forced repatriation. The following day, the Haitian Refugee Center, Inc., representing a class of interdicted Haitians, filed a complaint in the United States District Court for the Southern District

---

[11] A "refugee" as defined in 8 U. S. C. § 1101(a)(42)(A), is entitled to apply for a discretionary grant of asylum pursuant to 8 U. S. C. § 1158. The term "refugee" includes "any person who is outside any country of such person's nationality or, in the case of a person having no nationality, is outside any country in which such person last habitually resided, and who is unable or unwilling to return to, and is unable or unwilling to avail himself or herself of the protection of, that country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion . . . ."

Section 1158(a) provides: "The Attorney General shall establish a procedure for an alien *physically present in the United States or at a land border or port of entry,* irrespective of such alien's status, to apply for asylum, and the alien may be granted asylum in the discretion of the Attorney General if the Attorney General determines that such alien is a refugee within the meaning of section 1101(a)(42)(A) of this title." (Emphasis added.) This standard for asylum is similar to, but not quite as strict as, the standard applicable to a withholding of deportation pursuant to § 243(h)(1). See generally *INS* v. *Cardoza-Fonseca,* 480 U. S. 421 (1987).

of Florida alleging that the Government had failed to establish and implement adequate procedures to protect Haitians who qualified for asylum. The District Court granted temporary relief that precluded any repatriations until February 4, 1992, when a reversal on appeal in the Court of Appeals for the Eleventh Circuit and a denial of certiorari by this Court effectively terminated that litigation. See *Haitian Refugee Center, Inc.* v. *Baker*, 949 F. 2d 1109 (1991) *(per curiam)*, cert. denied, 502 U. S. 1122 (1992).

In the meantime the Haitian exodus expanded dramatically. During the six months after October 1991, the Coast Guard interdicted over 34,000 Haitians. Because so many interdicted Haitians could not be safely processed on Coast Guard cutters, the Department of Defense established temporary facilities at the United States Naval Base in Guantanamo, Cuba, to accommodate them during the screening process. Those temporary facilities, however, had a capacity of only about 12,500 persons. In the first three weeks of May 1992, the Coast Guard intercepted 127 vessels (many of which were considered unseaworthy, overcrowded, and unsafe); those vessels carried 10,497 undocumented aliens. On May 22, 1992, the United States Navy determined that no additional migrants could safely be accommodated at Guantanamo. App. 231–233.

With both the facilities at Guantanamo and available Coast Guard cutters saturated, and with the number of Haitian emigrants in unseaworthy craft increasing (many had drowned as they attempted the trip to Florida), the Government could no longer both protect our borders *and* offer the Haitians even a modified screening process. It had to choose between allowing Haitians into the United States for the screening process or repatriating them without giving them any opportunity to establish their qualifications as refugees. In the judgment of the President's advisers, the first choice not only would have defeated the original purpose of the program (controlling illegal immigration),

but also would have impeded diplomatic efforts to restore democratic government in Haiti and would have posed a life-threatening danger to thousands of persons embarking on long voyages in dangerous craft.[12] The second choice would have advanced those policies but deprived the fleeing Haitians of any screening process at a time when a significant minority of them were being screened in. See *id.*, at 66.

On May 23, 1992, President Bush adopted the second choice.[13] After assuming office, President Clinton decided

---

[12] See App. 244–245.

[13] Executive Order No. 12807 reads in relevant part as follows:

"Interdiction of Illegal Aliens

"By the authority vested in me as President by the Constitution and the laws of the United States of America, including sections 212(f) and 215(a)(1) of the Immigration and Nationality Act, as amended (8 U. S. C. 1182(f) and 1185(a)(1)), and whereas:

"(1) The President has authority to suspend the entry of aliens coming by sea to the United States without necessary documentation, to establish reasonable rules and regulations regarding, and other limitations on, the entry or attempted entry of aliens into the United States, and to repatriate aliens interdicted beyond the territorial sea of the United States;

"(2) The international legal obligations of the United States under the United Nations Protocol Relating to the Status of Refugees (U. S. T. I. A. S. 6577; 19 U. S. T. 6223) to apply Article 33 of the United Nations Convention Relating to the Status of Refugees do not extend to persons located outside the territory of the United States;

"(3) Proclamation No. 4865 suspends the entry of all undocumented aliens into the United States by the high seas; and

"(4) There continues to be a serious problem of persons attempting to come to the United States by sea without necessary documentation and otherwise illegally;

"I, GEORGE BUSH, President of the United States of America, hereby order as follows:

.          .          .          .          .

"Sec. 2. (a) The Secretary of the Department in which the Coast Guard is operating, in consultation, where appropriate, with the Secretary of Defense, the Attorney General, and the Secretary of State, shall issue appro-

not to modify that order; it remains in effect today. The wisdom of the policy choices made by Presidents Reagan, Bush, and Clinton is not a matter for our consideration. We

priate instructions to the Coast Guard in order to enforce the suspension of the entry of undocumented aliens by sea and the interdiction of any defined vessel carrying such aliens.

. . . . .

"(c) Those instructions to the Coast Guard shall include appropriate directives providing for the Coast Guard:

"(1) To stop and board defined vessels, when there is reason to believe that such vessels are engaged in the irregular transportation of persons or violations of United States law or the law of a country with which the United States has an arrangement authorizing such action.

"(2) To make inquiries of those on board, examine documents and take such actions as are necessary to carry out this order.

"(3) To return the vessel and its passengers to the country from which it came, or to another country, when there is reason to believe that an offense is being committed against the United States immigration laws, or appropriate laws of a foreign country with which we have an arrangement to assist; provided, however, that the Attorney General, in his unreviewable discretion, may decide that a person who is a refugee will not be returned without his consent.

"(d) These actions, pursuant to this section, are authorized to be undertaken only beyond the territorial sea of the United States.

. . . . .

"Sec. 5. This order shall be effective immediately.
   /s/ George Bush
THE WHITE HOUSE
*May 24, 1992."* 57 Fed. Reg. 23133–23134.

Although the Executive Order itself does not mention Haiti, the press release issued contemporaneously explained:

"President Bush has issued an executive order which will permit the U. S. Coast Guard to begin returning Haitians picked up at sea directly to Haiti. This action follows a large surge in Haitian boat people seeking to enter the United States and is necessary to protect the lives of the Haitians, whose boats are not equipped for the 600-mile sea journey.

"The large number of Haitian migrants has led to a dangerous and unmanageable situation. Both the temporary processing facility at the U. S. Naval base Guantanamo and the Coast Guard cutters on patrol are filled to capacity. The President's action will also allow con-

must decide only whether Executive Order No. 12807, 57 Fed. Reg. 23133 (1992), which reflects and implements those choices, is consistent with § 243(h) of the INA.

## II

Respondents filed this lawsuit in the United States District Court for the Eastern District of New York on March 18, 1992—before the promulgation of Executive Order No. 12807. The plaintiffs include organizations that represent interdicted Haitians as well as Haitians who were then being detained at Guantanamo. They sued the Commissioner of the Immigration and Naturalization Service, the Attorney General, the Secretary of State, the Commandant of the Coast Guard, and the Commander of the Guantanamo Naval Base, complaining that the screening procedures provided on Coast Guard cutters and at Guantanamo did not adequately protect their statutory and treaty rights to apply for refugee status and avoid repatriation to Haiti.

They alleged that the September 1991 coup had "triggered a continuing widely publicized reign of terror in Haiti"; that over 1,500 Haitians were believed to "have been killed or subjected to violence and destruction of their property because of their political beliefs and affiliations"; and that thousands of Haitian refugees "have set out in small boats that

---

tinued orderly processing of more than 12,000 Haitians presently at Guantanamo.

"Through broadcasts on the Voice of America and public statements in the Haitian media we continue to urge Haitians not to attempt the dangerous sea journey to the United States. Last week alone eighteen Haitians perished when their vessel capsized off the Cuban coast.

"Under current circumstances, the safety of Haitians is best assured by remaining in their country. We urge any Haitians who fear persecution to avail themselves of our refugee processing service at our Embassy in Port-au-Prince. The Embassy has been processing refugee claims since February. We utilize this special procedure in only four countries in the world. We are prepared to increase the American embassy staff in Haiti for refugee processing if necessary." App. 327.

are often overloaded, unseaworthy, lacking basic safety equipment, and operated by inexperienced persons, braving the hazards of a prolonged journey over high seas in search of safety and freedom." App. 24.

In April, the District Court granted the plaintiffs a preliminary injunction requiring defendants to give Haitians on Guantanamo access to counsel for the screening process. We stayed that order on April 22, 1992, 503 U. S. 1000, and, while the defendants' appeal from it was pending, the President issued the Executive Order now under attack. Plaintiffs then applied for a temporary restraining order to enjoin implementation of the Executive Order. They contended that it violated § 243(h) of the Act and Article 33 of the United Nations Protocol Relating to the Status of Refugees. The District Court denied the application because it concluded that § 243(h) is "unavailable as a source of relief for Haitian aliens in international waters," and that such a statutory provision was necessary because the Protocol's provisions are not "self-executing." App. to Pet. for Cert. 166a–168a.[14]

The Court of Appeals reversed. *Haitian Centers Council, Inc.* v. *McNary,* 969 F. 2d 1350 (CA2 1992). After concluding that the decision of the Eleventh Circuit in *Haitian Refugee Center, Inc.* v. *Baker,* 953 F. 2d 1498 (1992), did not bar its consideration of the issue, the court held that § 243(h)(1) does not apply only to aliens within the United States. The court found its conclusion mandated by both

---

[14] This decision was not based on agreement with the Executive's policy. The District Court wrote: "On its face, Article 33 imposes a mandatory duty upon contracting states such as the United States not to return refugees to countries in which they face political persecution. Notwithstanding the explicit language of the Protocol and dicta in Supreme Court cases such as *INS* v. *Cardoza Fonseca,* 480 U. S. 421 (1987) and *INS* v. *Stevic,* 467 U. S. 407 (1984), the controlling precedent in the Second Circuit is *Bertrand* v. *Sava* which indicates that the Protocols' provisions are not self-executing. *See* 684 F. 2d 204, 218 (2d Cir. 1982)." App. to Pet. for Cert. 166a–167a.

the broad definition of the term "alien" in § 101(a)(3)[15] and the plain language of § 243(h), from which the 1980 amendment had removed the words "within the United States."[16] The court reasoned that the text of the statute defeated the Eleventh Circuit's reliance on the placement of § 243(h)(1) in Part V of the INA (titled "Deportation; Adjustment of Status") as evidence that it applied only to aliens in the United States.[17] Moreover, the Court of Appeals rejected the Government's suggestion that since § 243(h) restricted actions of the Attorney General only, it did not limit the President's

---

[15] Section 101(a)(3), 8 U. S. C. § 1101(a)(3), provides: "The term 'alien' means any person not a citizen or national of the United States."

[16] "Before 1980, § 243(h) distinguished between two groups of aliens: those 'within the United States', and all others. After 1980, § 243(h)(1) no longer recognized that distinction, although § 243(h)(2)(C) preserves it for the limited purposes of the 'serious nonpolitical crime' exception. The government's reading would require us to rewrite § 243(h)(1) into its pre-1980 status, but we may not add terms or provisions where congress has omitted them, see *Gregory* v. *Ashcroft*, [501 U. S. 452, 467] (1991); *West Virginia Univ. Hosps., Inc.* v. *Casey*, [499 U. S. 83, 101] (1991), and this restraint is even more compelling when congress has specifically removed a term from a statute: 'Few principles of statutory construction are more compelling than the proposition that Congress does not intend *sub silentio* to enact statutory language that it has earlier discarded.' *Nachman Corp.* v. *Pension Benefit Guaranty Corp.*, 446 U. S. 359, 392–93 . . . (1980) (Stewart, J., dissenting) (quoted with approval in *INS* v. *Cardoza-Fonseca*, 480 U. S. at 442–43 . . .). 'To supply omissions transcends the judicial function.' *Iselin* v. *United States*, 270 U. S. 245, 250 . . . (1926) (Brandeis, J.)." 969 F. 2d, at 1359.

[17] "The statute's location in Part V reflects its original placement there before 1980—when § 243(h) applied by its terms only to 'deportation'. Since 1980, however, § 243(h)(1) has applied to more than just 'deportation'—it applies to 'return' as well (the former is necessarily limited to aliens 'in the United States', the latter applies to all aliens). Thus, § 243, which applies to all aliens, regardless of whereabouts, has broader application than most other portions of Part V, each of which is limited by its terms to aliens 'in' or 'within' the United States; but the fact that § 243 is surrounded by sections more limited in application has no bearing on the proper reading of § 243 itself." *Id.*, at 1360.

power to order the Coast Guard to repatriate undocumented aliens intercepted on the high seas.

Nor did the Court of Appeals accept the Government's reliance on Article 33 of the United Nations Convention Relating to the Status of Refugees.[18] It recognized that the 1980 amendment to the INA had been intended to conform our statutory law to the provisions of the Convention,[19] but it read Article 33.1's prohibition against return, like the statute's, "plainly" to cover "*all* refugees, regardless of location." 969 F. 2d, at 1362. This reading was supported by the "object and purpose" not only of that Article but also of the Convention as a whole.[20] While the Court of Appeals recognized that the negotiating history of the Convention disclosed that the representatives of at least six countries[21] construed the Article more narrowly, it thought that those views might have represented a dissenting position and that, in any event, it would "turn statutory construction on its head" to

[18] July 28, 1951, 19 U. S. T. 6259, T. I. A. S. No. 6577.

[19] See *INS* v. *Cardoza-Fonseca*, 480 U. S., at 436–437. Although the United States is not a signatory to the Convention itself, in 1968 it acceded to the United Nations Protocol Relating to the Status of Refugees, which bound the parties to comply with Articles 2 through 34 of the Convention as to persons who had become refugees because of events taking place after January 1, 1951. See *INS* v. *Stevic*, 467 U. S., at 416. Because the Convention established Article 33, and the Protocol merely incorporated it, we shall refer throughout this opinion to the Convention, even though it is the Protocol that applies here.

[20] "One of the considerations stated in the Preamble to the Convention is that the United Nations has 'endeavored to assure refugees the widest possible exercise of . . . fundamental rights and freedoms.' The government's offered reading of Article 33.1, however, would narrow the exercise of those freedoms, since refugees in transit, but not present in a sovereign area, could freely be returned to their persecutors. This would hardly provide refugees with 'the widest possible exercise' of fundamental human rights, and would indeed render Article 33.1 'a cruel hoax.'" 969 F. 2d, at 1363.

[21] The Netherlands, Belgium, the Federal Republic of Germany, Italy, Sweden, and Switzerland. See *id.*, at 1365.

allow ambiguous legislative history to outweigh the Convention's plain text. *Id.*, at 1366.[22]

The Second Circuit's decision conflicted with the Eleventh Circuit's decision in *Haitian Refugee Center* v. *Baker,* 953 F. 2d 1498 (1992), and with the opinion expressed by Judge Edwards in *Haitian Refugee Center* v. *Gracey,* 257 U. S. App. D. C. 367, 410–414, 809 F. 2d 794, 837–841 (1987) (opinion concurring in part and dissenting in part). Because of the manifest importance of the issue, we granted certiorari, 506 U. S. 814 (1992).[23]

## III

Both parties argue that the plain language of § 243(h)(1) is dispositive. It reads as follows:

> "The Attorney General shall not deport or return any alien (other than an alien described in section 1251(a)(4)(D) of this title) to a country if the Attorney General determines that such alien's life or freedom would be threatened in such country on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U. S. C. § 1253(h)(1) (1988 ed., Supp. IV).

Respondents emphasize the words "any alien" and "return"; neither term is limited to aliens within the United States. Respondents also contend that the 1980 amendment deleting the words "within the United States" from the prior text of § 243(h), see n. 2, *supra,* obviously gave the statute an

---

[22]Judge Newman concurred separately, *id.*, at 1368–1369, and Judge Walker dissented, noting that the 1980 amendment eliminating the phrase "within the United States" evidenced only an intent to extend the coverage of § 243(h) to exclusion proceedings because the Court had previously interpreted those words as limiting the section's coverage to deportation proceedings, *id.*, at 1375–1377. See *Leng May Ma* v. *Barber,* 357 U. S. 185, 187–189 (1958); see also *Plyler* v. *Doe,* 457 U. S. 202, 212–213, n. 12 (1982).

[23] On November 30, 1992, we denied respondents' motion to suspend briefing. 506 U. S. 996.

extraterritorial effect. This change, they further argue, was required in order to conform the statute to the text of Article 33.1 of the Convention, which they find as unambiguous as the present statutory text.

Petitioners' response is that a fair reading of the INA as a whole demonstrates that § 243(h) does not apply to actions taken by the President or Coast Guard outside the United States; that the legislative history of the 1980 amendment supports their reading; and that both the text and the negotiating history of Article 33 of the Convention indicate that it was not intended to have any extraterritorial effect.

We shall first review the text and structure of the statute and its 1980 amendment, and then consider the text and negotiating history of the Convention.

A. The Text and Structure of the INA

Although § 243(h)(1) refers only to the Attorney General, the Court of Appeals found it "difficult to believe that the proscription of § 243(h)(1)—returning an alien to his persecutors—was forbidden if done by the attorney general but permitted if done by some other arm of the executive branch." 969 F. 2d, at 1360. Congress "understood" that the Attorney General is the "President's agent for dealing with immigration matters," and would intend any reference to her to restrict similar actions of any Government official. *Ibid.* As evidence of this understanding, the court cited 8 U. S. C. § 1103(a). That section, however, conveys to us a different message. It provides, in part:

> "The Attorney General shall be charged with the administration and enforcement of this chapter and all other laws relating to the immigration and naturalization of aliens, *except insofar as this chapter or such laws relate to the powers, functions, and duties conferred upon the President, the Secretary of State, the officers of the Department of State, or diplomatic or consular officers . . . ."* (Emphasis added.)

Other provisions of the Act expressly confer certain responsibilities on the Secretary of State,[24] the President,[25] and, indeed, on certain other officers as well.[26] The 1981 and 1992 Executive Orders expressly relied on statutory provisions that confer authority on the President to suspend the entry of "any class of aliens" or to "impose on the entry of aliens any restrictions he may deem to be appropriate."[27] We cannot say that the interdiction program created by the President, which the Coast Guard was ordered to enforce, usurped authority that Congress had delegated to, or implicated responsibilities that it had imposed on, the Attorney General alone.[28]

[24] See 8 U. S. C. §§ 1104, 1105, 1153, 1201, and 1202 (1988 ed. and Supp. IV).

[25] See 8 U. S. C. §§ 1157(a), (b), and (d); § 1182(f); §§ 1185(a) and (b); and § 1324a(d) (1988 ed. and Supp. IV).

[26] See §§ 1161(a), (b), and (c) (Secretaries of Agriculture and Labor); § 1188 (Secretary of Labor); § 1421 (federal courts).

[27] Title 8 U. S. C. § 1182(f) provides: "Whenever the President finds that the entry of any aliens or of any class of aliens into the United States would be detrimental to the interests of the United States, he may by proclamation, and for such period as he shall deem necessary, suspend the entry of all aliens or any class of aliens as immigrant or nonimmigrants, or impose on the entry of aliens any restrictions he may deem to be appropriate."

[28] It is true that Executive Order No. 12807, 57 Fed. Reg. 23133, 23134 (1992), grants the Attorney General certain authority under the interdiction program ("The Secretary of the Department in which the Coast Guard is operating, in consultation, where appropriate, with the . . . Attorney General . . . shall issue appropriate instructions to the Coast Guard," and "the Attorney General, in his unreviewable discretion, may decide that a person who is a refugee will not be returned without his consent"). Under the first phrase, however, any authority the Attorney General retains is subsidiary to that of the Coast Guard's leaders, who give the appropriate commands, and of the Coast Guard itself, which carries them out. As for the second phrase, under neither President Bush nor President Clinton has the Attorney General chosen to exercise those discretionary powers. Even if she had, she would have been carrying out an executive, rather than a legislative, command, and therefore would not necessarily have

The reference to the Attorney General in the statutory text is significant not only because that term cannot reasonably be construed to describe either the President or the Coast Guard, but also because it suggests that it applies only to the Attorney General's normal responsibilities under the INA. The most relevant of those responsibilities for our purposes are her conduct of the deportation and exclusion hearings in which requests for asylum or for withholding of deportation under § 243(h) are ordinarily advanced. Since there is no provision in the statute for the conduct of such proceedings outside the United States, and since Part V and other provisions of the INA [29] obviously contemplate that such proceedings would be held in the country, we cannot reasonably construe § 243(h) to limit the Attorney General's actions in geographic areas where she has not been authorized to conduct such proceedings. Part V of the INA contains no reference to a possible extraterritorial application.

Even if Part V of the Act were not limited to strictly domestic procedures, the presumption that Acts of Congress do not ordinarily apply outside our borders would support an interpretation of § 243(h) as applying only within United States territory. See, e. g., EEOC v. Arabian American Oil Co., 499 U. S. 244, 248 (1991) (citing Foley Bros., Inc. v. Filardo, 336 U. S. 281, 285 (1949)); Lujan v. Defenders of Wildlife, 504 U. S. 555, 585–589, and n. 4 (1992) (STEVENS, J., concurring in judgment); see also Argentine Republic v. Amerada Hess Shipping Corp., 488 U. S. 428, 440 (1989) ("When it desires to do so, Congress knows how to place the high seas within the jurisdictional reach of a statute"). The Court of Appeals held that the presumption against extraterritoriality had "no relevance in the present context" because there was no risk that § 243(h), which can be enforced only

---

been bound by § 243(h)(1). Respondents challenge a program of interdiction and repatriation established by the President and enforced by the Coast Guard.

[29] See, e. g., § 1158(a), quoted in n. 11, supra.

in United States courts against the United States Attorney General, would conflict with the laws of other nations. 969 F. 2d, at 1358. We have recently held, however, that the presumption has a foundation broader than the desire to avoid conflict with the laws of other nations. *Smith* v. *United States*, 507 U. S. 197, 206–207, n. 5 (1993).

Respondents' expansive interpretation of the word "return" raises another problem: It would make the word "deport" redundant. If "return" referred solely to the destination to which the alien is to be removed, it alone would have been sufficient to encompass aliens involved in both deportation and exclusion proceedings. And if Congress had meant to refer to all aliens who might be sent back to potential oppressors, regardless of their location, the word "deport" would have been unnecessary. By using both words, the statute implies an exclusively territorial application, in the context of both kinds of domestic immigration proceedings. The use of both words reflects the traditional division between the two kinds of aliens and the two kinds of hearings. We can reasonably conclude that Congress used the two words "deport" and "return" only to make § 243(h)'s protection available in both deportation and exclusion proceedings. Indeed, the history of the 1980 amendment confirms that conclusion.

## B. The History of the Refugee Act of 1980

As enacted in 1952, § 243(h) authorized the Attorney General to withhold deportation of aliens "within the United States."[30] Six years later we considered the question whether it applied to an alien who had been paroled into the country while her admissibility was being determined. We held that even though she was physically present within our borders, she was not "within the United States" as those words were used in § 243(h). *Leng May Ma* v. *Barber*, 357

---

[30] 66 Stat. 214; see also n. 2, *supra.*

U. S. 185, 186 (1958).[31]  We explained the important distinction between "deportation" or "expulsion," on the one hand, and "exclusion," on the other:

> "It is important to note at the outset that our immigration laws have long made a distinction between those aliens who have come to our shores seeking admission, such as petitioner, and those who are within the United States after an entry, irrespective of its legality.  In the latter instance the Court has recognized additional rights and privileges not extended to those in the former category who are merely 'on the threshold of initial entry.'  *Shaughnessy* v. *United States ex rel. Mezei,* 345 U. S. 206, 212 (1953).  See *Kwong Hai Chew* v. *Colding,* 344 U. S. 590, 596 (1953).  The distinction was carefully preserved in Title II of the Immigration and Nationality Act."  *Id.,* at 187.

Under the INA, both then and now, those seeking "admission" and trying to avoid "exclusion" were already within our territory (or at its border), but the law treated them as though they had never entered the United States at all; they were within United States territory but not "within the United States."  Those who had been admitted (or found their way in) but sought to avoid "expulsion" had the added benefit of "deportation proceedings"; they were both within United States territory *and* "within the United States." *Ibid.*  Although the phrase "within the United States" presumed the alien's actual presence in the United States, it had more to do with an alien's legal status than with his location.

The 1980 amendment erased the long-maintained distinction between deportable and excludable aliens for purposes of § 243(h).  By adding the word "return" and removing the words "within the United States" from § 243(h), Congress ex-

---

[31] "We conclude that petitioner's parole did not alter her status as an excluded alien or otherwise bring her 'within the United States' in the meaning of § 243(h)."  357 U. S., at 186.

tended the statute's protection to both types of aliens, but it did nothing to change the presumption that both types of aliens would continue to be found only within United States territory. The removal of the phrase "within the United States" cured the most obvious drawback of § 243(h): As interpreted in *Leng May Ma*, its protection was available only to aliens subject to deportation proceedings.

Of course, in addition to this most obvious purpose, it is possible that the 1980 amendment *also* removed any territorial limitation of the statute, and Congress might have intended a double-barreled result.[32] That possibility, however, is not a substitute for the affirmative evidence of intended extraterritorial application that our cases require. Moreover, in our review of the history of the amendment, we have found no support whatsoever for that latter, alternative, purpose.

The addition of the phrase "or return" and the deletion of the phrase "within the United States" are the only relevant changes made by the 1980 amendment to § 243(h)(1), and they are fully explained by the intent to apply § 243(h) to exclusion as well as to deportation proceedings. That intent is plainly identified in the legislative history of the amendment.[33] There is no change in the 1980 amendment, however, that could only be explained by an assumption that Congress also intended to provide for the statute's extraterritorial application. It would have been extraordinary for Congress to make such an important change in the law without any mention of that possible effect. Not a scintilla of evidence of such an intent can be found in the legislative history.

---

[32] Even respondents acknowledge that § 243(h) did not apply extraterritorially before its amendment. See Brief for Respondents 9, 12.

[33] See H. R. Rep. No. 96–608, p. 30 (1979) (the changes "require . . . the Attorney General to withhold deportation of aliens who qualify as refugees and who are in exclusion as well as deportation, proceedings"); see also S. Rep. No. 96–256, p. 17 (1979).

In sum, all available evidence about the meaning of § 243(h)—the Government official at whom it is directed, its location in the Act, its failure to suggest any extraterritorial application, the 1980 amendment that gave it a dual reference to "deport or return," and the relevance of that dual structure to immigration law in general—leads unerringly to the conclusion that it applies in only one context: the domestic procedures by which the Attorney General determines whether deportable and excludable aliens may remain in the United States.

## IV

Although the protection afforded by § 243(h) did not apply in exclusion proceedings before 1980, other provisions of the Act did authorize relief for aliens at the border seeking protection as refugees in the United States. See *INS* v. *Stevic*, 467 U. S., at 415–416. When the United States acceded to the Protocol in 1968, therefore, the INA already offered *some* protection to both classes of refugees. It offered *no* such protection to any alien who was beyond the territorial waters of the United States, though, and we would not expect the Government to assume a burden as to those aliens without some acknowledgment of its dramatically broadened scope. Both Congress and the Executive Branch gave extensive consideration to the Protocol before ratifying it in 1968; in all of their published consideration of it there appears no mention of the possibility that the United States was assuming any extraterritorial obligations.[34] Neverthe-

---

[34] "The President and the Senate believed that the Protocol was largely consistent with existing law. There are many statements to that effect in the legislative history of the accession to the Protocol. *E. g.*, S. Exec. Rep. No. 14, 90th Cong., 2d Sess., 4 (1968) ('refugees in the United States have long enjoyed the protection and the rights which the protocol calls for'); *id.*, at 6, 7 ('the United States already meets the standards of the Protocol'); see also, *id.*, at 2; S. Exec. K, 90th Cong., 2d Sess., III, VII (1968); 114 Cong. Rec. 29391 (1968) (remarks of Sen. Mansfield); *id.*, at 27757 (remarks of Sen. Proxmire). And it was 'absolutely clear' that the Protocol would not 'requir[e] the United States to admit new categories or

less, because the history of the 1980 Act does disclose a general intent to conform our law to Article 33 of the Convention, it might be argued that the extraterritorial obligations imposed by Article 33 were so clear that Congress, in acceding to the Protocol, and then in amending the statute to harmonize the two, meant to give the latter a correspondingly extraterritorial effect. Or, just as the statute might have imposed an extraterritorial obligation that the Convention does not (the argument we have just rejected), the Convention might have established an extraterritorial obligation which the statute does not; under the Supremacy Clause, that broader treaty obligation might then provide the controlling rule of law.[35] With those possibilities in mind we shall consider both the text and negotiating history of the Convention itself.

Like the text and the history of § 243(h), the text and negotiating history of Article 33 of the United Nations Convention are both completely silent with respect to the Article's possible application to actions taken by a country outside its own borders. Respondents argue that the Protocol's broad remedial goals require that a nation be prevented from repatriating refugees to their potential oppressors whether or not the refugees are within that nation's borders. In spite

numbers of aliens.' S. Exec. Rep. No. 14, *supra*, at 19. It was also believed that apparent differences between the Protocol and existing statutory law could be reconciled by the Attorney General in administration and did not require any modification of statutory language. See, *e. g.*, S. Exec. K, *supra*, at VIII." *INS* v. *Stevic*, 467 U. S., at 417–418.

[35] United States Const., Art. VI, cl. 2, provides: "This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land . . . ." In *Murray* v. *Schooner Charming Betsy*, 2 Cranch 64, 117–118 (1804), Chief Justice Marshall wrote that "an act of congress ought never to be construed to violate the law of nations if any other possible construction remains . . . ." See also *Weinberger* v. *Rossi*, 456 U. S. 25, 32 (1982); *Clark* v. *Allen*, 331 U. S. 503, 508–511 (1947); *Cook* v. *United States*, 288 U. S. 102, 118–120 (1933).

of the moral weight of that argument, both the text and negotiating history of Article 33 affirmatively indicate that it was not intended to have extraterritorial effect.

A. The Text of the Convention

Two aspects of Article 33's text are persuasive. The first is the explicit reference in Article 33.2 to the country in which the alien is located; the second is the parallel use of the terms "expel or return," the latter term explained by the French word "refouler."

The full text of Article 33 reads as follows:

> *"Article 33.—Prohibition of Expulsion or Return ('refoulement')*
>
> "1. No Contracting State shall expel or return *('refouler')* a refugee in any manner whatsoever to the frontiers of territories where his life or freedom would be threatened on account of his race, religion, nationality, membership of a particular social group or political opinion.
>
> "2. The benefit of the present provision may not, however, be claimed by a refugee whom there are reasonable grounds for regarding as a danger to the security of *the country in which he is,* or who, having been convicted by a final judgment of a particularly serious crime, constitutes a danger to the community of that country."
>
> Convention Relating to the Status of Refugees, July 28, 1951, 19 U. S. T. 6259, 6276, T. I. A. S. No. 6577 (emphasis added).

Under the second paragraph of Article 33 an alien may not claim the benefit of the first paragraph if he poses a danger to the country in which he is located. If the first paragraph did apply on the high seas, no nation could invoke the second paragraph's exception with respect to an alien there: An alien intercepted on the high seas is in no country at all. If Article 33.1 applied extraterritorially, therefore, Article 33.2

would create an absurd anomaly: Dangerous aliens on the high seas would be entitled to the benefits of 33.1 while those residing in the country that sought to expel them would not. It is more reasonable to assume that the coverage of 33.2 was limited to those already in the country because it was understood that 33.1 obligated the signatory state only with respect to aliens within its territory.[36]

Article 33.1 uses the words "expel or return ('refouler')" as an obvious parallel to the words "deport or return" in § 243(h)(1). There is no dispute that "expel" has the same meaning as "deport"; it refers to the deportation or expulsion of an alien who is already present in the host country. The dual reference identified and explained in our opinion in *Leng May Ma* v. *Barber* suggests that the term "return ('refouler')" refers to the exclusion of aliens who are merely " 'on the threshold of initial entry.' " 357 U. S., at 187 (quoting *Shaughnessy* v. *United States ex rel. Mezei,* 345 U. S. 206, 212 (1953)).

This suggestion—that "return" has a legal meaning narrower than its common meaning—is reinforced by the parenthetical reference to *"refouler,"* a French word that is *not* an exact synonym for the English word "return." Indeed, neither of two respected English-French dictionaries mentions *"refouler"* as one of many possible French translations

---

[36] Although the parallel provision in § 243(h)(2)(D), 8 U. S. C. § 243(h) (2)(D), that was added to the INA in 1980 does not contain the "country in which he is" language, the general understanding that it was intended to conform the statute to the Protocol leads us to give it that reading, particularly since its text is otherwise so similar to Article 33.2. It provides that § 243(h)(1) "shall not apply" to an alien if the Attorney General determines that "there are reasonable grounds for regarding the alien as a danger to the security of the United States." Thus the statutory term "security of the United States" replaces the Protocol's term "security of the country in which he is." The parallel surely implies that for statutory purposes "the United States" is "the country in which he is."

of "return."[37]   Conversely, the English translations of *re-fouler*" do not include the word "return."[38]   They do, however, include words like "repulse," "repel," "drive back," and even "expel."   To the extent that they are relevant, these

---

[37] The New Cassell's French Dictionary 440 (1973) gives this translation: "return (I) [ríˊtəːn], *v.i.* Revenir (to come back); retourner (to go back); rentrer (to come in again); répondre, répliquer (to answer). *To return to the subject*, revenir au sujet, *(fam.)* revenir à ses moutons.—*v.t.* Rendre (to give back); renvoyer (to send back); rembourser (to repay); rapporter (interest); répondre à; rendre compte (to render an account of); élire (candidates). *He was returned*, il fut élu; *the money returns interest*, l'argent rapporte intérêt; *to return good for evil*, rendre le bien pour le mal.—*n.* Retour (coming back, going back), *m.*; rentrée (coming back in), *f.*; renvoi (sending back), *m.*; remise en place (putting back), *f.*; profit, gain (profit), *m.*; restitution (restitution), *f.*; remboursement (reimbursement), *m.*; élection (election), *f.*; rapport, compte rendu, relevé, état (report); *(Comm.* montant des opérations, montant des remises; bilan (of a bank), *m.*; *(pl.)* produit, *m.   By return of post*, par retour du courrier; *in return for*, en retour de; *nil return*, état néant, *m.*; *on my return*, au retour, comme je revenais chez moi; *on sale or return*, en dépôt, en commission; *return address*, addrese de l'expéditeur, *f.*; *return home*, retour au foyer, *m.*; *return journey*, retour, *m.*; *return match*, revanche, *f.*; *return of casualties*, état des pertes, *m.*; *small profits (and) quick returns*, petits profits, vente rapide; *the official returns*, les relevés officiels, *m.pl.*; *to make some return for*, payer de retour."
Although there are additional translations in the Larousse Modern French-English Dictionary 545 (1978), "refouler" is not among them.

[38] "refouler [rəfúle], *v.t.*   To drive back, to back (train etc.); to repel; to compress; to repress, to suppress, to inhibit; to expel (aliens); to refuse entry; to stem (the tide); to tamp; to tread (grapes etc.) again; to full (stuffs) again; to ram home (the charge in a gun). *Refouler la marée*, to stem, to go against the tide.—*v.i.*   To ebb, to flow back. *La marée refoule*, the tide is ebbing."   Cassell's, at 627.

"refouler [-le] v. tr. (1). To stem (la marée). ‖ NAUT. To stem (un courant). ‖ TECHN. To drive in (une cheville); to deliver (l'eau); to full (une étoffe); to compress (un gaz); to hammer, to fuller (du métal). ‖ MILIT. To repulse (une attaque); to drive back, to repel (l'ennemi); to ram home (un projectile). ‖ PHILOS. To repress (un instinct). ‖ CH. DE F. To back (un train). ‖ FIG. To choke back (un sanglot).

"—v. intr. To flow back (foule); to ebb, to be on the ebb (marée). ‖ MÉD. *Refoulé*, inhibited."   Larousse, at 607.

translations imply that "return" means a defensive act of resistance or exclusion at a border rather than an act of transporting someone to a particular destination. In the context of the Convention, to "return" means to "repulse" rather than to "reinstate." [39]

The text of Article 33 thus fits with Judge Edwards' understanding that " 'expulsion' would refer to a 'refugee already admitted into a country' and that 'return' would refer to a 'refugee already within the territory but not yet resident there.' Thus, the Protocol was not intended to govern parties' conduct outside of their national borders." *Haitian Refugee Center* v. *Gracey*, 257 U. S. App. D. C., at 413, 809 F. 2d, at 840 (footnotes omitted). From the time of the Convention, commentators have consistently agreed with this view.[40]

---

[39] Under Article 33, after all, a nation is not prevented from sending a threatened refugee back only to his homeland, or even to the country that he has most recently departed; in some cases Article 33 would even prevent a nation from sending a refugee to a country where he had never been. Because the word "return," in its common meaning, would make no sense in that situation (one cannot return, or be returned, to a place one has never been), we think it means something closer to "exclude" than "send back."

[40] See, *e. g.*, N. Robinson, Convention Relating to the Status of Refugees: Its History, Contents and Interpretation 162–163 (1953) ("The *Study on Statelessness*[, U. N. Dept. of Social Affairs 60 (1949),] defined 'expulsion' as 'the juridical decision taken by the judicial or administrative authorities whereby an individual is ordered to leave the territory of the country' and 'reconduction' (which is the equivalent of 'refoulement' and was changed by the Ad Hoc Committee to the word 'return') as 'the mere physical act of ejecting from the national territory a person residing therein who has gained entry or is residing regularly or irregularly.' . . . Art. 33 concerns refugees who have gained entry into the territory of a Contracting State, legally or illegally, but not to refugees who seek entrance into [the] territory"); 2 A. Grahl-Madsen, The Status of Refugees in International Law 94 (1972) ("*[Non-refoulement]* may only be invoked in respect of persons who are already present—lawfully or unlawfully—in the territory of a Contracting State. Article 33 only prohibits the expulsion or return *(refoulement)* of refugees to territories where they are likely to suffer perse-

The drafters of the Convention and the parties to the Protocol—like the drafters of § 243(h)—may not have contemplated that any nation would gather fleeing refugees and return them to the one country they had desperately sought to escape; such actions may even violate the spirit of Article 33; but a treaty cannot impose uncontemplated extraterritorial obligations on those who ratify it through no more than its general humanitarian intent. Because the text of Article 33 cannot reasonably be read to say anything at all about a nation's actions toward aliens outside its own territory, it does not prohibit such actions.[41]

---

cution; it does not obligate the Contracting State to admit any person who has not already set foot on their respective territories"). A more recent work describes the evolution of *non-refoulement* into the international (and possibly extraterritorial) duty of nonreturn relied on by respondents, but it also admits that in 1951 *non-refoulement* had a narrower meaning, and did not encompass extraterritorial obligations. Moreover, it describes both "expel" and "return" as terms referring to one nation's transportation of an alien out of its own territory and into another. See G. Goodwin-Gill, The Refugee in International Law 74–76 (1983).

Even the United Nations High Commissioner for Refugees has implicitly acknowledged that the Convention has no extraterritorial application. While conceding that the Convention does not mandate any specific procedure by which to determine whether an alien qualifies as a refugee, the "basic requirements" his office has established impose an exclusively territorial burden, and announce that any alien protected by the Convention (and by its promise of *non-refoulement*) will be found either " 'at the border or in the territory of a Contracting State.' " Office of United Nations High Commissioner for Refugees, Handbook on Procedures and Criteria for Determining Refugee Status 46 (Geneva, Sept. 1979) (quoting Official Records of the General Assembly, Thirty-second Session, Supplement No. 12 (A/32/12/Add.1), paragraph 53(6)(e)). Those basic requirements also establish the right of an applicant for refugee status " 'to remain *in the country* pending a decision on his initial request.' " Handbook on Refugee Status, at 460 (emphasis added).

[41] The Convention's failure to prevent the extraterritorial reconduction of aliens has been generally acknowledged (and regretted). See Aga Khan, Legal Problems Relating to Refugees and Displaced Persons, in Hague Academy of Int'l Law, 149 Recueil des Cours 287, 318 (1976) ("Does the *non-refoulement* rule . . . apply . . . only to those already within the

## B. The Negotiating History of the Convention

In early drafts of the Convention, what finally emerged as Article 33 was numbered 28. At a negotiating conference of plenipotentiaries held in Geneva, Switzerland, on July 11, 1951, the Swiss delegate explained his understanding that the words "expel" and "return" covered only refugees who had entered the host country. He stated:

> "Mr. ZUTTER (Switzerland) said that the Swiss Federal Government saw no reason why article 28 should not be adopted as it stood; for the article was a necessary one. He thought, however, that its wording left room for various interpretations, particularly as to the meaning to be attached to the words 'expel' and 'return'. In the Swiss Government's view, the term "expulsion" applied to a refugee who had already been admitted to the territory of a country. The term *'refoulement'*, on the other hand, had a vaguer meaning; *it could not, however, be applied to a refugee who had not yet entered the territory of a country.* The word 'return', used in the English text, gave that idea exactly. Yet article 28 implied the existence of two categories of refugee: refugees who were liable to be expelled, and those who were liable to be returned. In any case, the States represented at the Conference should take a definite position with regard to the meaning to be attached to the word 'return'. The Swiss Government considered that in the

territory of the Contracting State? . . . There is thus a serious gap in refugee law as established by the 1951 Convention and other related instruments and it is high time that this gap should be filled"); Robinson, Convention Relating to the Status of Refugees, at 163 ("[I]f a refugee has succeeded in eluding the frontier guards, he is safe; if he has not, it is his hard luck. It cannot be said that this is a satisfactory solution of the problem of asylum"); Goodwin-Gill, The Refugee in International Law, at 87 ("A categorical refusal of disembarkation cannot be equated with breach of the principle of *non-refoulement*, even though it may result in serious consequences for asylum-seekers").

present instance *the word applied solely to refugees who had already entered a country, but were not yet resident there.* According to that interpretation, States were not compelled to allow large groups of persons claiming refugee status to cross its frontiers. He would be glad to know whether the States represented at the Conference accepted his interpretations of the two terms in question. If they did, Switzerland would be willing to accept article 28, which was one of the articles in respect of which States could not, under article 36 of the draft Convention, enter a reservation." (Emphases added.)[42]

No one expressed disagreement with the position of the Swiss delegate on that day or at the session two weeks later when Article 28 was again discussed. At that session, the delegate of the Netherlands recalled the Swiss delegate's earlier position:

"Baron van BOETZELAER (Netherlands) recalled that at the first reading the Swiss representative had expressed the opinion that the word 'expulsion' related to a refugee already admitted into a country, whereas the word 'return' *('refoulement')* related to a refugee *already within the territory but not yet resident there.* According to that interpretation, article 28 would not have involved any obligations in the possible case of mass migrations across frontiers or of attempted mass migrations.

"He wished to revert to that point, because the Netherlands Government attached very great importance to the scope of the provision now contained in article 33. The Netherlands could not accept any legal obligations in respect of large groups of refugees seeking access to its territory.

---

[42] Conference of Plenipotentiaries on the Status of Refugees and Stateless Persons, Summary Record of the Sixteenth Meeting, U. N. Doc. A/CONF.2/SR.16, p. 6 (July 11, 1951).

"At the first reading the representatives of Belgium, the Federal Republic of Germany, Italy, the Netherlands and Sweden had supported the Swiss interpretation. From conversations he had since had with other representatives, he had gathered that the general consensus of opinion was in favour of the Swiss interpretation.

"In order to dispel any possible ambiguity and to reassure his Government, he wished to have it placed on record that the Conference was in agreement with the interpretation that the possibility of mass migrations across frontiers or of attempted mass migrations was not covered by article 33.

"There being no objection, the PRESIDENT *ruled* that the interpretation given by the Netherlands representative should be placed on record.

"Mr. HOARE (United Kingdom) remarked that the Style Committee had considered that the word 'return' was the nearest equivalent in English to the French term *'refoulement'*. He assumed that the word 'return' as used in the English text had no wider meaning.

"The PRESIDENT suggested that in accordance with the practice followed in previous Conventions, the French word *'refoulement'* (*'refouler'* in verbal uses) should be included in brackets and between inverted commas after the English word 'return' wherever the latter occurred in the text." (Emphasis added.)[43]

Although the significance of the President's comment that the remarks should be "placed on record" is not entirely clear, this much cannot be denied: At one time there was a "general consensus," and in July 1951 several delegates understood the right of *non-refoulement* to apply only to

---

[43] Conference of Plenipotentiaries on the Status of Refugees and Stateless Persons, Summary Record of the Thirty-fifth Meeting, U. N. Doc. A/CONF.2/SR.35, pp. 21–22 (July 25, 1951).

aliens physically present in the host country.[44]   There is no record of any later disagreement with that position.   Moreover, the term *"refouler"* was included in the English version of the text to avoid the expressed concern about an inappropriately broad reading of the English word "return."

Therefore, even if we believed that Executive Order No. 12807 violated the intent of some signatory states to protect all aliens, wherever they might be found, from being transported to potential oppressors, we must acknowledge that other signatory states carefully—and successfully—sought to avoid just that implication.   The negotiating history, which suggests that the Convention's limited reach resulted from a deliberate bargain, is not dispositive, but it solidly supports our reluctance to interpret Article 33 to impose obligations on the contracting parties that are broader than the text commands.   We do not read that text to apply to aliens interdicted on the high seas.

## V

Respondents contend that the dangers faced by Haitians who are unwillingly repatriated demonstrate that the judgment of the Court of Appeals fulfilled the central purpose of the Convention and the Refugee Act of 1980.   While we must, of course, be guided by the high purpose of both the treaty and the statute, we are not persuaded that either one places any limit on the President's authority to repatriate aliens interdicted beyond the territorial seas of the United States.

It is perfectly clear that 8 U. S. C. § 1182(f), see n. 27, *supra*, grants the President ample power to establish a naval blockade that would simply deny illegal Haitian migrants the ability to disembark on our shores.   Whether the President's chosen method of preventing the "attempted mass migra-

---

[44] The Swiss delegate's statement strongly suggests, moreover, that at least one nation's accession to the Convention was *conditioned* on this understanding.

tion" of thousands of Haitians—to use the Dutch delegate's phrase—poses a greater risk of harm to Haitians who might otherwise face a long and dangerous return voyage is irrelevant to the scope of his authority to take action that neither the Convention nor the statute clearly prohibits. As we have already noted, Acts of Congress normally do not have extraterritorial application unless such an intent is clearly manifested. That presumption has special force when we are construing treaty and statutory provisions that may involve foreign and military affairs for which the President has unique responsibility. Cf. *United States* v. *Curtiss-Wright Export Corp.*, 299 U. S. 304 (1936). We therefore find ourselves in agreement with the conclusion expressed in Judge Edwards' concurring opinion in *Gracey*, 257 U. S. App. D. C., at 414, 809 F. 2d, at 841:

> "This case presents a painfully common situation in which desperate people, convinced that they can no longer remain in their homeland, take desperate measures to escape. Although the human crisis is compelling, there is no solution to be found in a judicial remedy."

The judgment of the Court of Appeals is reversed.

*It is so ordered.*

JUSTICE BLACKMUN, dissenting.

When, in 1968, the United States acceded to the United Nations Protocol Relating to the Status of Refugees, Jan. 31, 1967, [1968] 19 U. S. T. 6223, T. I. A. S. No. 6577, it pledged not to "return *('refouler')* a refugee in any manner whatsoever" to a place where he would face political persecution. In 1980, Congress amended our immigration law to reflect the Protocol's directives. Refugee Act of 1980, 94 Stat. 102. See *INS* v. *Cardoza-Fonseca*, 480 U. S. 421, 429, 436–437, 440 (1987); *INS* v. *Stevic*, 467 U. S. 407, 418, 421 (1984). Today's majority nevertheless decides that the forced repatriation of

the Haitian refugees is perfectly legal, because the word "return" does not mean return, *ante,* at 174, 180–182, because the opposite of "within the United States" is not outside the United States, *ante,* at 175, and because the official charged with controlling immigration has no role in enforcing an order to control immigration, *ante,* at 171–173.

I believe that the duty of nonreturn expressed in both the Protocol and the statute is clear. The majority finds it "extraordinary," *ante,* at 176, that Congress would have intended the ban on returning "any alien" to apply to aliens at sea. That Congress would have meant what it said is not remarkable. What is extraordinary in this case is that the Executive, in disregard of the law, would take to the seas to intercept fleeing refugees and force them back to their persecutors—and that the Court would strain to sanction that conduct.

I

I begin with the Convention,[1] for it is undisputed that the Refugee Act of 1980 was passed to conform our law to Article 33, and that "the nondiscretionary duty imposed by § 243(h) parallels the United States' mandatory *nonrefoulement* obligations under Article 33.1 . . . ." *INS* v. *Doherty,* 502 U. S. 314, 331 (1992) (SCALIA, J., concurring in judgment in part and dissenting in part). See also *Cardoza-Fonseca,* 480 U. S., at 429, 436–437, 440; *Stevic,* 467 U. S., at 418, 421. The Convention thus constitutes the backdrop against which the statute must be understood.[2]

---

[1] United Nations Convention Relating to the Status of Refugees, July 28, 1951, 19 U. S. T. 6259, 189 U. N. T. S. 150, T. I. A. S. No. 6577. Because the Protocol to which the United States acceded incorporated the Convention's Article 33, I shall follow the form of the majority, see *ante,* at 169, n. 19, and shall refer throughout this dissent (unless the distinction is relevant) only to the Convention.

[2] This Court has recognized that Article 33 has independent force. See, *e. g., INS* v. *Stevic,* 467 U. S., at 428–430, n. 22 (By modifying his discretionary practice, Attorney General " 'implemented' " and "honor[ed]" the Protocol's requirements). Because I agree with the near-universal under-

## A

Article 33.1 of the Convention states categorically and without geographical limitation:

> "No Contracting State shall expel or return *('refouler')* a refugee in any manner whatsoever to the frontiers of territories where his life or freedom would be threatened on account of his race, religion, nationality, membership of a particular social group or political opinion."

The terms are unambiguous. Vulnerable refugees shall not be returned. The language is clear, and the command is straightforward; that should be the end of the inquiry. Indeed, until litigation ensued, see *Haitian Refugee Center* v. *Gracey*, 257 U. S. App. D. C. 367, 809 F. 2d 794 (1987), the Government consistently acknowledged that the Convention applied on the high seas.[3]

The majority, however, has difficulty with the treaty's use of the term "return *('refouler')*." "Return," it claims, does not mean return, but instead has a distinctive legal meaning.

_____

standing that the obligations imposed by treaty and the statute are coextensive, I do not find it necessary to rely on the Protocol standing alone. As the majority suggests, however, *ante*, at 178, to the extent that the treaty is more generous than the statute, the latter should not be read to limit the former.

[3] See, *e. g.*, 5 Op. Off. Legal Counsel 242, 248 (1981) (under proposed interdiction of Haitian flag vessels, "[i]ndividuals who claim that they will be persecuted . . . must be given an opportunity to substantiate their claims" under the Convention); United States as a Country of Mass First Asylum: Hearing before the Subcommittee on Immigration and Refugee Policy of the Senate Committee on the Judiciary, 97th Cong., 1st Sess., 208–209 (1981) (letter from Office of Attorney General stating: "Aliens who have not reached our borders (such as those on board interdicted vessels) are . . . protected . . . by the U. N. Convention and Protocol"); *id.*, at 4 (statement by Thomas O. Enders, Assistant Secretary of State for Inter-American Affairs, regarding the Haitian interdiction program: "I would like to also underscore that we intend fully to carry out our obligations under the U. N. Protocol on the status of refugees").

*Ante,* at 180. For this proposition the Court relies almost entirely on the fact that *American* law makes a general distinction between *deportation* and *exclusion.* Without explanation, the majority asserts that in light of this distinction the word "return" as used in the treaty somehow must refer only to "the exclusion of aliens who are . . . 'on the threshold of initial entry.'" *Ibid.* (citation omitted).

Setting aside for the moment the fact that respondents in this case seem very much "on the threshold of initial entry"—at least in the eyes of the Government that has ordered them seized for "attempting to come to the United States by sea without necessary documentation," Preamble to Exec. Order No. 12807, 57 Fed. Reg. 23133 (1992)—I find this tortured reading unsupported and unnecessary. The text of the Convention does not ban the "exclusion" of aliens who have reached some indeterminate "threshold"; it bans their "return." It is well settled that a treaty must first be construed according to its "ordinary meaning." Article 31.1 of the Vienna Convention on the Law of Treaties, 1155 U. N. T. S. 331, T. S. No. 58 (1980), 8 I. L. M. 679 (1969). The ordinary meaning of "return" is "to bring, send, or put (a person or thing) back to or in a former position." Webster's Third New International Dictionary 1941 (1986). That describes precisely what petitioners are doing to the Haitians. By dispensing with ordinary meaning at the outset, and by taking instead as its starting point the assumption that "return," as used in the treaty, "has a legal meaning narrower than its common meaning," *ante,* at 180, the majority leads itself astray.

The straightforward interpretation of the duty of nonreturn is strongly reinforced by the Convention's use of the French term *"refouler."* The ordinary meaning of *"refouler,"* as the majority concedes, *ante,* at 181–182, is "[t]o repulse, . . . ; to drive back, to repel." Larousse Modern French-

English Dictionary 631 (1981).[4] Thus construed, Article 33.1 of the Convention reads: "No contracting state shall expel or [repulse, drive back, or repel] a refugee in any manner whatsoever to the frontiers of territories where his life or freedom would be threatened . . . ." That, of course, is exactly what the Government is doing. It thus is no surprise that when the French press has described the very policy challenged here, the term it has used is *"refouler."* See, *e. g., Le bourbier haïtien,* Le Monde, May 31–June 1, 1992 ("[L]es Etats-Unis ont décidé de refouler directement les réfugiés recueillis par la garde cotiéré." (The United States has decided [de refouler] directly the refugees picked up by the Coast Guard)).

And yet the majority insists that what has occurred is not, in fact, *"refoulement."* It reaches this conclusion in a peculiar fashion. After acknowledging that the ordinary meaning of *"refouler"* is "repulse," "repel," and "drive back," the majority without elaboration declares: "To the extent that they are relevant, these translations imply that 'return' means a defensive act of resistance or exclusion at a border . . . ." *Ante,* at 181–182. I am at a loss to find the narrow notion of "exclusion at a border" in broad terms like "repulse," "repel," and "drive back." Gage was repulsed (initially) at Bunker Hill. Lee was repelled at Gettysburg. Rommel was driven back across North Africa. The majority's puzzling progression (*"refouler"* means repel or drive back; therefore "return" means only exclude at a border; therefore the treaty does not apply) hardly justifies a departure from the path of ordinary meaning. The text of Article

---

[4] The Court seems no more convinced than I am by petitioners' argument that "refouler" is best translated as "expel." See Brief for Petitioners 38–39. That interpretation, as the Second Circuit observed, would leave the treaty redundantly forbidding a nation to "expel" or "expel" a refugee. *Haitian Centers Council, Inc.* v. *McNary,* 969 F. 2d 1350, 1363 (1992).

33.1 is clear, and whether the operative term is "return" or *"refouler,"* it prohibits the Government's actions.[5]

Article 33.1 is clear not only in what it says, but also in what it does not say: It does not include any geographical limitation. It limits only where a refugee may be sent "to," not where he may be sent from. This is not surprising, given that the aim of the provision is to protect refugees against persecution.

Article 33.2, by contrast, *does* contain a geographical reference, and the majority seizes upon this as evidence that the section as a whole applies only within a signatory's borders. That inference is flawed. Article 33.2 states that the benefit of Article 33.1

> "may not . . . be claimed by a refugee whom there are reasonable grounds for regarding as a danger to the security of the country in which he is, or who, having been convicted by a final judgment of a particularly serious crime, constitutes a danger to the community of that country."

The signatories' understandable decision to allow nations to deport criminal aliens who have entered their territory hardly suggests an intent to permit the apprehension and return of noncriminal aliens who have not entered their territory, and who may have no desire ever to enter it. One wonders what the majority would make of an exception that

---

[5] I am surprised by the majority's apparent belief that (a) the translations of *"refouler"* are of uncertain relevance ("To the extent that they are relevant, these translations imply . . ."), and (b) the term *"refouler"* is pertinent only as an aid to understanding the meaning of the English word "return" ("these translations imply that 'return' means . . ."). *Ante,* at 181–182. The first assumption suggests disregard for the basic rule that consideration of a treaty's ordinary meaning must be the first step in its interpretation. The second assumption, by neglecting to treat the term *"refouler"* as significant in and of itself, overlooks the fact that under Article 46 the French and English versions of the Convention's text are equally authoritative.

removed from the Article's protection all refugees who "constitute a danger to their families." By the majority's logic, the inclusion of such an exception presumably would render Article 33.1 applicable only to refugees with families.

Far from constituting "an absurd anomaly," *ante*, at 180, the fact that a state is permitted to "expel or return" a small class of refugees found within its territory but may not seize and return refugees who remain outside its frontiers expresses precisely the objectives and concerns of the Convention. Nonreturn is the rule; the sole exception (neither applicable nor invoked here) is that a nation endangered by a refugee's very presence may "expel or return" him to an unsafe country if it chooses. The tautological observation that only a refugee already in a country can pose a danger to the country "in which he is" proves nothing.

## B

The majority further relies on a remark by Baron van Boetzelaer, the Netherlands' delegate at the Convention's negotiating conference, to support its contention that Article 33 does not apply extraterritorially. This reliance, for two reasons, is misplaced. First, the isolated statement of a delegate to the Convention cannot alter the plain meaning of the treaty itself. Second, placed in its proper context, Van Boetzelaer's comment does not support the majority's position.

It is axiomatic that a treaty's plain language must control absent "extraordinarily strong contrary evidence." *Sumitomo Shoji America, Inc.* v. *Avagliano,* 457 U. S. 176, 185 (1982). See also *United States* v. *Stuart,* 489 U. S. 353, 371 (1989) (SCALIA, J., concurring in judgment); *id.,* at 370 (KENNEDY, J., concurring in part and concurring in judgment). Reliance on a treaty's negotiating history *(travaux preparatoires)* is a disfavored alternative of last resort, appropriate only where the terms of the document are obscure or lead to "manifestly absurd or unreasonable" results. See Vienna

Convention on the Law of Treaties, Art. 32, 1155 U. N. T. S., at 340, 8 I. L. M., at 692. Moreover, even the general rule of treaty construction allowing limited resort to *travaux preparatoires* "has no application to oral statements made by those engaged in negotiating the treaty which were not embodied in any writing and were not communicated to the government of the negotiator or to its ratifying body." *Arizona* v. *California*, 292 U. S. 341, 360 (1934). There is no evidence that the comment on which the majority relies was ever communicated to the United States Government or to the Senate in connection with the ratification of the Protocol.

The pitfalls of relying on the negotiating record are underscored by the fact that Baron van Boetzelaer's remarks almost certainly represent, in the words of the United Nations High Commissioner for Refugees, a mere "parliamentary gesture by a delegate whose views did *not* prevail upon the negotiating conference as a whole" (emphasis in original). Brief for Office of United Nations High Commissioner for Refugees as *Amicus Curiae* 24. The Baron, like the Swiss delegate whose sentiments he restated, expressed a desire to reserve the right to *close borders* to *large groups* of refugees. "According to [the Swiss delegate's] interpretation, States were not compelled to allow large groups of persons claiming refugee status to cross [their] frontiers." Conference of Plenipotentiaries on the Status of Refugees and Stateless Persons, Summary Record of the Sixteenth Meeting, U. N. Doc. A/CONF.2/SR.16, p. 6 (July 11, 1951). Article 33, Van Boetzelaer maintained, "would not have involved any obligations in the possible case of mass migrations across frontiers or of attempted mass migrations" and this was important because "[t]he Netherlands could not accept any legal obligations in respect of large groups of refugees seeking access to its territory." Conference of Plenipotentiaries on the Status of Refugees and Stateless Persons, Summary Record of the Thirty-fifth Meeting, U. N. Doc. A/CONF.2/SR.35, pp. 21–22 (July 25, 1951) (hereafter A/Conf.2/SR.35).

Yet no one seriously contends that the treaty's protections depend on the number of refugees who are fleeing persecution. Allowing a state to disavow "any obligations" in the case of mass migrations or attempted mass migrations would eviscerate Article 33, leaving it applicable only to "small" migrations and "small" attempted migrations.

There is strong evidence as well that the Conference rejected the right to close land borders where to do so would trap refugees in the persecutors' territory.[6] Indeed, the majority agrees that the Convention *does* apply to refugees who have reached the border. *Ante*, at 181–182. The majority thus cannot maintain that Van Boetzelaer's interpretation prevailed.

---

[6] In proceedings prior to that at which Van Boetzelaer made his remarks, the Ad Hoc Committee delegates from France, Belgium, and the United Kingdom had made clear that the principle of *non-refoulement*, which existed only in France and Belgium, *did* proscribe the rejection of refugees at a country's frontier. Ad Hoc Committee on Statelessness and Related Problems, Summary Record of the Twenty-First Meeting, U. N. Doc. E/AC.32/SR.21, pp. 4–5 (1950). Consistent with the United States' historically strong support of nonreturn, the United States delegate to the Committee, Louis Henkin, confirmed this:

"Whether it was a question of closing the frontier to a refugee who asked admittance, or of turning him back after he had crossed the frontier, or even of expelling him after he had been admitted to residence in the territory, the problem was more or less the same.

"Whatever the case might be . . . he must not be turned back to a country where his life or freedom could be threatened. No consideration of public order should be allowed to overrule that guarantee, for if the State concerned wished to get rid of the refugee at all costs, it could send him to another country or place him in an internment camp." Ad Hoc Committee on Statelessness and Related Problems, Summary Record of the Twentieth Meeting, U. N. Doc. E/AC.32/SR.20, ¶¶ 54 and 55, pp. 11–12 (1950).

Speaking next, the Israeli delegate to the Ad Hoc Committee concluded: "The Committee had already settled the humanitarian question of sending any refugee . . . back to a territory where his life or liberty might be in danger." *Id.*, ¶ 61, at 13.

That it did not is evidenced by the fact that Baron van Boetzelaer's interpretation was merely "placed on record," unlike formal amendments to the Convention which were "agreed to" or "adopted."[7]  It should not be assumed that other delegates agreed with the comment simply because they did not object to their colleague's request to memorialize it, and the majority's statement that "this much cannot be denied: At one time there was a 'general consensus,'" *ante*, at 186, is wrong.  All that can be said is that at one time Baron van Boetzelaer remarked that "he had gathered" that there was a general consensus, and that his interpretation was placed on record.

In any event, even if Van Boetzelaer's statement *had* been "agreed to" as reflecting the dominant view, this is not a case about the right of a nation to close its borders.  This is a case in which a Nation has gone forth to *seize* aliens who are *not* at its borders and *return* them to persecution.  Nothing in the comments relied on by the majority even hints at an intention on the part of the drafters to countenance a course of conduct so at odds with the Convention's basic purpose.[8]

---

[7] See, *e. g.*, A/Conf.2/SR.35, at 22 ("adopt[ing] unanimously" the proposal to place the word *"refouler"* alongside the word "return"; *ibid.* ("adopt[ing] unanimously" the suggestion that the words "membership of a particular social group" be inserted); *ibid.* ("agree[ing]" to changes in the actual wording of Article 33).

[8] The majority also cites secondary sources that, it claims, share its reading of the Convention.  See *ante*, at 182–184, nn. 40 and 41.  Not one of these authorities suggests that any signatory nation sought to reserve the right to seize refugees outside its territory and forcibly return them to their persecutors.  Indeed, the first work cited explains that the entire reason for the drafting of Article 33 was "the consideration that the turning back of a refugee to the frontiers of a country where his life or freedom is threatened on account of race or similar grounds would be tantamount to delivering him into the hands of his persecutors."  N. Robinson, Convention Relating to the Status of Refugees: Its History, Contents and Interpretation 161 (1953).  These sources emphasize instead

In sum, the fragments of negotiating history upon which the majority relies are not entitled to deference, were never voted on or adopted, probably represent a minority view, and in any event do not address the issue in this case. It goes without saying, therefore, that they do not provide the "extraordinarily strong contrary evidence," *Sumitomo Shoji America, Inc.*, 457 U. S., at 185, required to overcome the Convention's plain statement: "No Contracting State shall expel or return *('refouler')* a refugee in any manner whatsoever to the frontiers of territories where his life or freedom would be threatened . . . ."

---

that nations need not *admit* refugees or grant them *asylum*—questions not at issue here. See, *e. g.*, 2 A. Grahl-Madsen, The Status of Refugees in International Law 94 (1972) ("Article 33 only prohibits the expulsion or return *(refoulement)* of refugees to territories where they are likely to suffer persecution; it does not obligate the Contracting States to *admit* any person who has not already set foot on their respective territories") (emphasis added); G. Goodwin-Gill, The Refugee in International Law 87 (1983) ("[A] categorical refusal of disembarkation cannot be equated with breach of the principle of *non-refoulement*, even though it may result in serious consequences for *asylum*-seekers") (emphasis added); Aga Khan, Legal Problems Relating to Refugees and Displaced Persons, in Hague Academy of Int'l Law, 149 Recuil des Cours 287, 318 (1976) ("Does the *non-refoulement* rule thus laid down apply to refugees who present themselves at the frontier or only to those who are already within the territory of the Contracting State? . . . . It is intentional that the Convention fails to mention *asylum* as a right which the contracting States would undertake to grant to a refugee who, presenting himself at their frontiers, seeks the benefit of it. . . . There is thus a serious gap in refugee law as established by the 1951 Convention and other related instruments and it is high time that this gap should be filled") (emphasis added). The majority also cites incidental territorial references in the 1979 Handbook on Procedures and Criteria for Determining Refugee Status as "implici[t] acknowledg[ment]" that the United Nations High Commissioner for Refugees subscribes to their view that the Convention has no extraterritorial application. *Ante*, at 183, n. 40. The majority neglects to point out that the current High Commissioner for Refugees acknowledges that the Convention *does* apply extraterritorially. See Brief for United Nations High Commissioner for Refugees as *Amicus Curiae*.

II

A

Like the treaty whose dictates it embodies, §243(h) of the Immigration and Nationality Act of 1952 (INA) is unambiguous. It reads:

> "The Attorney General shall not deport or return any alien . . . to a country if the Attorney General determines that such alien's life or freedom would be threatened in such country on account of race, religion, nationality, membership in a particular social group, or political opinion." 8 U. S. C. §1253(h)(1) (1988 ed., Supp. IV).

"With regard to this very statutory scheme, we have considered ourselves bound to assume that the legislative purpose is expressed by the ordinary meaning of the words used." *Cardoza-Fonseca*, 480 U. S., at 431 (internal quotation marks omitted). Ordinary, but not literal. The statement that "the Attorney General shall not deport or return any alien" obviously does not mean simply that the person who is the Attorney General at the moment is forbidden personally to deport or return any alien, but rather that her agents may not do so. In the present case the Coast Guard without question is acting as the agent of the Attorney General. "The officers of the Coast Guard insofar as they are engaged . . . in enforcing any law of the United States shall . . . be deemed to be acting as agents of the particular executive department . . . charged with the administration of the particular law . . . and . . . be subject to all the rules and regulations promulgated by such department . . . with respect to the enforcement of that law." 14 U. S. C. §89(b). The Coast Guard is engaged in enforcing the immigration laws. The sole identified purpose of Executive Order No. 12807 is to address the "serious problem of persons attempting to come to the United States by sea without necessary documentation and otherwise illegally." 57 Fed. Reg. 23133

(1992).   The Coast Guard's task under the order is "to enforce the suspension of the entry of undocumented aliens by sea and the interdiction of any defined vessel carrying such aliens."   *Ibid.*   The Coast Guard is authorized to return a vessel and its passengers *only* "when there is reason to believe that an offense is being committed against the United States immigration laws, or appropriate laws of a foreign country with which we have an arrangement to assist."   *Id.,* at 23134.

The majority suggests indirectly that the law which the Coast Guard enforces when it carries out the order to return a vessel reasonably believed to be violating the immigration laws is somehow not a law that the Attorney General is charged with administering.   *Ante,* at 171–173.   That suggestion is baseless.   Under 8 U. S. C. § 1103(a), the Attorney General, with some exceptions, "shall be charged with the administration and enforcement of this chapter and all other laws relating to the immigration and naturalization of aliens . . . ."   The majority acknowledges this designation, but speculates that the particular enforcement of immigration laws here may be covered by the exception for laws relating to " 'the powers, functions, and duties conferred upon the President, the Secretary of State, the officers of the Department of State, or diplomatic or consular officers . . . .' "   *Ante,* at 171.[9]   The majority fails to point out the proviso

---

[9] The Executive Order at issue cited as authority 8 *U. S. C.* § 1182(f), which allows the President to restrict or "for such period as he shall deem necessary, suspend the entry of all aliens or any class of aliens as immigrant or nonimmigrants."   The Haitians, of course, do not claim a right of entry.

Indeed, the very invocation of this section in this context is somewhat of a stretch.   The section pertains to the President's power to interrupt for as long as necessary *legal* entries into the United States.   Illegal entries cannot be "suspended"—they are already disallowed.   Nevertheless, the Proclamation on which the Order relies declares, solemnly and hopefully: "The entry of undocumented aliens from the high seas is hereby

that directly follows the exception: *"Provided, however,* That ... the Attorney General .... shall have the power and duty to control and guard the boundaries and borders of the United States against the illegal entry of aliens ...."    There can be no doubt that the Coast Guard is acting as the Attorney General's agent when it seizes and returns undocumented aliens.

Even the challenged Executive Order places the Attorney General "on the boat" with the Coast Guard.[10]    The Order purports to give the Attorney General "unreviewable discretion" to decide that an alien will not be returned.[11]    Discretion not to return an alien is of course discretion to return him.    Such discretion cannot be given; Congress removed it in 1980 when it amended the INA to make mandatory (*"shall not* deport or *return"*) what had been a discretionary function ("The Attorney General is authorized to withhold deportation").    The Attorney General may not decline to follow the command of § 243(h).    If she encounters a refugee, she must not return him to persecution.

The laws that the Coast Guard is engaged in enforcing when it takes to the seas under orders to prevent aliens from illegally crossing our borders are laws whose administration has been assigned to the Attorney General by Congress, which has plenary power over immigration matters.    *Kleindienst* v. *Mandel,* 408 U. S. 753, 766 (1972).    Accordingly, there is no merit to the argument that the concomitant legal restrictions placed on the Attorney General by Congress do not apply with full force in this case.

---

suspended ...."    Presidential Proclamation No. 4865, 3 CFR 50, 51 (1981–1983 Comp.).

[10] Of course the Attorney General's authority is not dependent on its recognition in the Order.

[11] "[T]he Attorney General, in his unreviewable discretion, may decide that a person who is a refugee will not be returned without his consent."

## B

Comparison with the pre-1980 version of § 243(h) confirms that the statute means what it says. Before 1980, § 243(h) provided:

> "The Attorney General is authorized to *withhold deportation* of any alien . . . *within the United States* to any country in which in his opinion the alien would be subject to persecution on account of race, religion, or political opinion and for such period of time as he deems to be necessary for such reason." 8 U. S. C. § 1253(h) (1976 ed., Supp. III) (emphasis added).

The Refugee Act of 1980 explicitly amended this provision in three critical respects. Congress (1) deleted the words "within the United States"; (2) barred the Government from "return[ing]," as well as "deport[ing]," alien refugees; and (3) made the prohibition against return mandatory, thereby eliminating the discretion of the Attorney General over such decisions.

The import of these changes is clear. Whether "within the United States" or not, a refugee may not be returned to his persecutors. To read into § 243(h)'s mandate a territorial restriction is to restore the very language that Congress removed. "Few principles of statutory construction are more compelling than the proposition that Congress does not intend *sub silentio* to enact statutory language that it has earlier discarded in favor of other language." *INS* v. *Cardoza-Fonseca*, 480 U. S., at 442–443 (citations omitted). Moreover, as all parties to this case acknowledge, the 1980 changes were made in order to conform our law to the United Nations Protocol. As has been shown above, that treaty's absolute ban on *refoulement* is similarly devoid of territorial restrictions.

The majority, however, downplays the significance of the deletion of "within the United States" to improvise a unique

meaning for "return." [12]   It does so not by analyzing Article
33, the provision that inspired the 1980 amendments, [13] but
by reference to a lone case from this Court that is not even
mentioned in the legislative history and that had been on the
books a full 22 years before the amendments' enactment.

In *Leng May Ma* v. *Barber*, 357 U. S. 185 (1958), this Court
decided that aliens paroled into the United States from de-
tention at the border were not "within the United States"
for purposes of the former § 243(h) and thus were not entitled
to its benefits.   Pointing to this decision, the majority offers
the negative inference that Congress' removal of the words
"within the United States" was meant only to extend a right
of nonreturn to those in exclusion proceedings.   But nothing
in *Leng May Ma* even remotely suggests that the *only* per-
sons not "within the United States" are those involved in
exclusion proceedings.   Indeed, such a suggestion would
have been ridiculous.   Nor does the narrow concept of exclu-
sion relate in any obvious way to the amendment's broad
phrase "return any alien."

The problems with the majority's *Leng May Ma* theory
run deeper, however.   When Congress in 1980 removed the

---

[12] The word "return" is used throughout the INA; in no instance is there
any indication that the word has a specialized meaning.  See, *e. g.,* 8
U. S. C. §§ 1101(a)(27)(A) ("special immigrant" is one lawfully admitted
"who is *returning* from a temporary visit abroad" (emphasis added));
1101(a)(42)(A) ("refugee" is a person outside his own country who is "un-
able or unwilling to *return* to" his country because of persecution (empha-
sis added)); 1182(a)(7)(B)(i)(I) (nonimmigrant who does not possess pass-
port authorizing him "to *return* to the country from which" he came is
excludable (emphasis added)); 1252(a)(1) (deportable alien's parole may be
revoked and the alien *"returned* to custody" (emphasis added)); 1353
(travel expenses will be paid for INS officers who "become eligible for
voluntary retirement and *return* to the United States" (emphasis added)).
It is axiomatic that "identical words used in different parts of the same
act are intended to have the same meaning."  *Atlantic Cleaners & Dyers,
Inc.* v. *United States*, 286 U. S. 427, 433 (1932).

[13] Indeed, reasoning backwards, the majority actually looks to the *Amer-
ican* scheme to illuminate the *treaty.*  See *ante,* at 180–181.

phrase "within the United States," it did not substitute any other geographical limitation. This failure is exceedingly strange in light of the majority's hypothesis that the deletion was intended solely to work the particular technical adjustment of extending protection to those physically present in, yet not legally admitted to, the United States. It is even stranger given what Congress did elsewhere in the Act. The Refugee Act revised the immigration code to establish a comprehensive, tripartite system for the protection of refugees fleeing persecution.[14] Section 207 governs overseas refugee processing. Section 208, in turn, governs asylum claims by aliens "physically present in the United States, or at a land border or port of entry." Unlike these sections, however, which explicitly apply to persons present in specific locations, the amended § 243(h) includes no such limiting language. The basic prohibition against forced return to persecution applies simply to "any alien." The design of all three sections is instructive, and it undermines the majority's assertion that § 243(h) was meant to apply only to aliens physically present in the United States or at one of its borders. When Congress wanted a provision to apply only to aliens "physically present in the United States, or at a land border or port of entry," it said so. See § 208(a).[15] An examination

---

[14] For this reason, the majority is mistaken to find any significance in the fact that the ban on return is located in the part of the INA that deals as well with the deportation and exclusion hearings in which requests for asylum or for withholding of deportation "are ordinarily advanced." *Ante,* at 173.

[15] Congress used the words "physically present within the United States" to delimit the reach not just of § 208 but of sections throughout the INA. See, *e. g.,* 8 U. S. C. §§ 1159 (adjustment of refugee status); 1101(a)(27)(I) (defining "special immigrant" for visa purposes); 1254(a)(1)–(2) (eligibility for suspension of deportation); 1255a(a)(3) (requirements for temporary resident status); 1401(d), (e), (g) (requirements for nationality but not citizenship at birth); 1409(c) (requirements for nationality status for children born out of wedlock); 1503(b) (requirement for appeal of denial of nationality status); and 1254a(c)(1)(A)(i), (c)(3)(B) (requirements for tem-

of the carefully designed provisions of the INA—not an elaborate theory about a 1958 case regarding the rights of aliens in exclusion proceedings—is the proper basis for an analysis of the statute.[16]

## C

That the clarity of the text and the implausibility of its theories do not give the majority more pause is due, I think, to the majority's heavy reliance on the presumption against extraterritoriality. The presumption runs throughout the majority's opinion, and it stacks the deck by requiring the Haitians to produce "affirmative evidence" that when Congress prohibited the return of "any" alien, it indeed meant to prohibit the interception and return of aliens at sea.

The judicially created canon of statutory construction against extraterritorial application of United States law has no role here, however. It applies only where congressional intent is "unexpressed." *EEOC* v. *Arabian American Oil Co.*, 499 U. S. 244, 248–259 (1991); *Foley Bros., Inc.* v. *Filardo*, 336 U. S. 281, 285 (1949). Here there is no room for

---

porary protected status). The majority offers no hypothesis for why Congress would not have done so here as well.

[16] Even if the majority's *Leng May Ma* proposition were correct, it would not support today's result. Leng May Ma was an excludable alien who had been in custody but was paroled into the United States. The Court determined that her parole did not change her legal status, and therefore that her case should be analyzed as if she were still "in custody." The Court then explained that "the detention of an alien in custody pending determination of his admissibility does not legally constitute an entry though the alien is physically within the United States," and stated: "It seems quite clear that an alien so confined would not be 'within the United States' for purposes of § 243(h)." 357 U. S., at 188. *Leng May Ma* stands for the proposition that aliens in custody who have not made legal entries—including, but not limited to, those who are granted the privilege of parole—are legally outside the United States. According to the majority, Congress deleted the territorial reference in order to extend protection to such aliens. By the majority's own reasoning, then, § 243(h) applies to unadmitted aliens held in United States custody. That, of course, is exactly the position in which the interdicted Haitians find themselves.

doubt: A territorial restriction has been deliberately deleted from the statute.

Even where congressional intent is unexpressed, however, a statute must be assessed according to its intended scope. The primary basis for the application of the presumption (besides the desire—not relevant here—to avoid conflict with the laws of other nations) is "the commonsense notion that Congress generally legislates with domestic concerns in mind." *Smith* v. *United States*, 507 U. S. 197, 204, n. 5 (1993). Where that notion seems unjustified or unenlightening, however, generally worded laws covering varying subject matters are routinely applied extraterritorially. See, *e. g., Hellenic Lines Ltd.* v. *Rhoditis*, 398 U. S. 306 (1970) (extraterritorial application of the Jones Act); *Steele* v. *Bulova Watch Co.*, 344 U. S. 280 (1952) (Lanham Act applies extraterritorially); *Kawakita* v. *United States*, 343 U. S. 717 (1952) (extraterritorial application of treason statute); *Ford* v. *United States*, 273 U. S. 593, 602 (1927) (applying National Prohibition Act to high seas despite its silence on issue of extraterritoriality).

In this case we deal with a statute that regulates a distinctively international subject matter: immigration, nationalities, and refugees. Whatever force the presumption may have with regard to a primarily domestic statute evaporates in this context. There is no danger that the Congress that enacted the Refugee Act was blind to the fact that the laws it was crafting had implications beyond this Nation's borders. The "commonsense notion" that Congress was looking inwards—perfectly valid in a case involving the Federal Tort Claims Act, such as *Smith*,—cannot be reasonably applied to the Refugee Act of 1980.

In this regard, the majority's dictum that the presumption has "special force" when we construe "statutory provisions that may involve foreign and military affairs for which the President has unique responsibility," *ante*, at 188, is completely wrong. The presumption that Congress did not in-

tend to legislate extraterritorially has *less* force—perhaps, indeed, no force at all—when a statute on its face relates to foreign affairs. What the majority appears to be getting at, as its citation to *United States* v. *Curtiss-Wright Export Corp.*, 299 U. S. 304 (1936), suggests, *ante,* at 188, is that in some areas, the President, and not Congress, has sole constitutional authority. Immigration is decidedly not one of those areas. " '[O]ver no conceivable subject is the legislative power of Congress more complete . . . .' " *Fiallo* v. *Bell,* 430 U. S. 787, 792 (1977), quoting *Oceanic Steam Navigation Co.* v. *Stranahan,* 214 U. S. 320, 339 (1909). And the suggestion that the President somehow is acting in his capacity as Commander in Chief is thwarted by the fact that nowhere among Executive Order No. 12807's numerous references to the immigration laws is that authority even once invoked.[17]

If any canon of construction should be applied in this case, it is the well-settled rule that "an act of congress ought never to be construed to violate the law of nations if any other possible construction remains." *Murray* v. *Schooner Charming Betsy,* 2 Cranch 64, 117–118 (1804). The majority's improbable construction of § 243(h), which flies in the face of the international obligations imposed by Article 33 of the Convention, violates that established principle.

## III

The Convention that the Refugee Act embodies was enacted largely in response to the experience of Jewish refugees in Europe during the period of World War II. The tragic consequences of the world's indifference at that time are well known. The resulting ban on *refoulement,* as broad as the humanitarian purpose that inspired it, is easily appli-

---

[17] Indeed, petitioners are hard pressed to argue that restraints on the Coast Guard infringe upon the Commander in Chief's power when the President himself has placed that agency under the direct control of the Department of Transportation. See Declaration of Admiral Leahy, App. 233.

cable here, the Court's protestations of impotence and regret notwithstanding.

The refugees attempting to escape from Haiti do not claim a right of admission to this country. They do not even argue that the Government has no right to intercept their boats. They demand only that the United States, land of refugees and guardian of freedom, cease forcibly driving them back to detention, abuse, and death. That is a modest plea, vindicated by the treaty and the statute. We should not close our ears to it.

I dissent.