Kiersten KING, Alicia Love, Natasha Martin, Leatrice Shacks, Brandie Tyus and Shylene Wright, Plaintiffs,

v.

**BOARD OF CONTROL OF EASTERN MICHIGAN UNIVERSITY,**
**Defendants.**

**No. 00–60466.**

United States District Court,
E.D. Michigan.

July 17, 2002.

George B. Washington, Scheff & Washington, Detroit, MI, for plaintiffs.

Rosemary G. Schikora, Dykema Gossett, Detroit, MI, Kiffi Y. Ford, Dykema Gossett, Lansing, MI, for defendants.

## OPINION AND ORDER OF THE COURT DENYING DEFENDANTS' MOTION TO DISMISS

BATTANI, District Judge.

## I. INTRODUCTION

Before the court is Defendants' motion to dismiss Plaintiffs' Title IX complaint of sex discrimination brought pursuant to Fed.R.Civ.P. 12(h)(3). Defendants assert that this court lacks subject matter jurisdiction.

## II. STATEMENT OF FACTS

Plaintiffs in this case are six African–American women, students at Eastern Michigan University ("EMU") at all relevant times, who participated in EMU's five week study abroad program in South Africa, the Intensive Educational and Cultural Program in South Africa or "IECPSA". The program ran from June 28, 1999 to July 30, 1999. Fifteen students were enrolled in the program, 12 from EMU and 3 from other institutions. Thus, *there were* 16 students (9 women and 7 men) of whom 9 (8 women and 1 man) left the program early. Plaintiffs left the program approximately one week early, on July 23, 1999, and flew back the United States. Plaintiffs assertedly left as the result of the harassing conduct of three male EMU students, Mestophia Frame, Maxie McCauley and William Miller. Frame and McCauley were participants in the program. Miller was hired by EMU to assist a disabled student and to act as Dr. Victor Okafor's assistant. The program was administered by EMU professors Dr. George Klein and Dr. Okafor. Dr. Okafor accompanied the students to South Africa while Dr. Klein remained in the United States.

### A. SEXUAL HARASSMENT ALLEGATIONS

It is alleged that in the first week of the trip McCauley entered a female student's room while she was sleeping without permission and without knocking. The student alleges that she awoke to find McCauley in her bed. That student is not a plaintiff here.

Also in the first week of the trip Frame, McCauley and Miller allegedly referred to female students as "sweetie", "darling" and "sweetheart". When King and Shacks asked to be called by their names, Miller stopped speaking with Shacks and told King that he had no use for her if she couldn't "act right". Plaintiffs allege that from that point on, Miller, McCauley and Frame began to refer to them by gender-specific slurs, "bitches", "sluts", "whores", "bimbos" and "cows". Miller called Shacks, King and Martin "hippos", "elephants" and "wideloads". Miller and McCauley referred to women as "gold diggers", "sluts", "whores", "pigeonheads" and "chickenheads". When female students objected, they responded that they would call women what they pleased. Plaintiffs alleged several specific incidents

of being called "sluts" and "whores" by the three men, as well as alleging that such terms were a daily part of the men's vocabulary and interaction with the women. At a student meaning, chaired by Dr. Okafor's assistant Miller, female students again objected to the slurs, derogatory terms and other sexually explicit behavior, and were again told that the men would do as they pleased. Miller told the female students to "stop bitching". On another occasion, Frame told Tyuse that she needed "a big stiff hard one up you to … loosen you up." On another occasion, Frame yelled at Tyuse to "get out of my room, bitch".

McCauley and Miller allegedly solicited South African women for sex from the tour bus. McCauley and Frame offered women students for "sale" to South African men at a nightclub, and again when the group's tour bus stopped at a liquor store. On another occasion, Frame offered to "sell" Martin to the group's bus driver.

Frame and McCauley referred to female students as "stupid", "ignorant", "dumb airheads" and "bimbos" during class. Frame and McCauley made sexual references during a Xhosa language class, asking the female instructor how to say "head" in Xhosa.

Finally, on July 24, 1999, the three men instigated a violent physical altercation with a number of male South African students. The cause of this altercation was allegedly the men's continued verbal abuse of female students. During this altercation McCauley brandished a knife. Frame struck a South African student on the head with a cane, causing a gash on the student's head. Frame then chased another South African student down the corridor, where he took refuge in a female student's room. Frame then began to kick and pound at the door, causing bruises to the female student who was attempting to hold the door closed against Frame's onslaught. Frame told Martin to "suck my dick" when she attempted to make him stop.

After this altercation, the six plaintiffs, and another female student Kate Welch, left the program more than a week before its scheduled conclusion. Dr. Okafor finished the trip with six male students and one female student.[1]

## B. ALLEGATIONS CONCERNING DR. OKAFOR'S KNOWLEDGE

William Miller was allegedly presented to the students as Dr. Okafor's assistant and were told that they should regard pronouncements from Miller as Dr. Okafor's instructions. Plaintiffs assert that during the trip Dr. Okafor reiterated that Miller was his representative and if the students had any problems with the program they were to go to him first.

While the students were in Cape Town, and prior to classes starting, a number of female students approached Dr. Okafor in the dining hall and told him they had concerns about the program and asked for a group meeting to discuss them. Plaintiffs assert that they planned to discuss their concerns about Miller, McCauley and Frame's conduct. Dr. Okafor agreed to the meeting, but did not attend. Rather he sent Miller in his stead, and Miller informed the students that he was standing in for Dr. Okafor and that any complaints about the program should go through him to Dr. Okafor. Dr. Okafor confirms that he sent Miller as his representative to the meeting and asked Miller to report back to him, and that Miller did so. Miller told Dr. Okafor that nothing of substance was discussed at the meeting.

1. Two other students had left the program earlier, allegedly as a result of Frame, McCau-ley and Miller's conduct.

However, that was not true. There had been a heated discussion of McCauley's entering Kate Welch's room without permission. In fact, Miller had a private discussion with McCauley and Welch concerning the incident. Further, there had been discussion, initiated by Plaintiff Shacks, concerning the mens' inappropriate conduct. Plaintiffs assert that the men informed them that they would continue with their conduct if they wanted to and Miller told Shacks to "stop bitching". Shacks reported Miller's comment to Dr. Okafor.

Additionally, Tyuse asserts that when she approached Dr. Okafor in the cafeteria in Cape Town about the meeting, he told her that he was not the person she should speak with.

Plaintiffs allege that Dr. Okafor was present during times when Miller and Frame referred to Plaintiffs as "bitches", "hos", "wideloads", "sluts" and so forth. Plaintiffs also allege the Dr. Okafor was present on occasions when Frame leaned out the window of the tour bus and propositioned South African women for sex. Plaintiffs also assert that Dr. Okafor was present in the classroom when Frame called Tyuse stupid, referred to some women as "bimbos" and "airheads", and called a white male student a stupid white boy.

Shacks and Love assert that they approached Dr. Okafor after classes began in Cape Town and complained about the men's inappropriate behavior both in and out of the classroom. Plaintiffs assert that Dr. Okafor did nothing. Further, program participant Travis Sloan asserts that he approached Dr. Okafor to complain that McCauley had threatened to slit his throat. He asserts that Dr. Okafor did nothing.

On July 22, 1999, King and Shacks called program director George Klein and reported the men's harassing conduct and the various problems with the program, including Dr. Okafor's apathy. King then had a private meeting with Dr. Okafor that evening to reiterate the concerns she had expressed to Dr. Klein. Dr. Okafor called a meeting with the students. Plaintiffs assert that he in no way addressed their complaints about the men's behavior. Rather, he told the group that this was his program and that anybody trying to ruin it would feel his wrath until victory was won. It was that evening when the violent confrontation between McCauley and Frame and the South African students took place, allegedly instigated by the men's continued verbal abuse of Plaintiffs. The next day, Plaintiffs left the program and flew back to the United States.

Plaintiffs brought, inter alia, a claim of sex discrimination in violation of Title IX against Defendants. Defendants now bring this motion to dismiss.

## III. LEGAL ANALYSIS

■ Fed.R.Civ.P. 12(h)(3) provides that "[w]henever it appears by suggestion of the parties or otherwise that the court lacks jurisdiction of the subject matter, the court shall dismiss the action." Defendants argue that insofar as Title IX does not have extraterritorial application this court lacks subject matter jurisdiction of Plaintiffs' Title IX claim. This is a case of first impression for this court.[2]

There is no dispute that the complained of actions took place outside the United States. It is also uncontested that the IECPSA is an "education program or activity", *infra*, to which Title IX's proscrip-

---

2. There is no case law in this or any Circuit Court of Appeals which addresses the question posed to the court. The only decision on this question is an unpublished opinion out of the Southern District of Indiana, *Earlham College v. Eisenberg,* Case No. IP 97-0592 (slip op. April 21, 1998).

tions against discrimination would otherwise apply.

Congress has the power to extend application of its laws extraterritorially. *Foley Bros. v. Filardo,* 336 U.S. 281, 284–285, 69 S.Ct. 575, 93 L.Ed. 680 (1949). The question for the court is whether Congress exercised that authority in reference to the given statute. Such a question is one of statutory interpretation. *Id. See also EEOC v. Arab American Oil Co.,* 499 U.S. 244, 111 S.Ct. 1227, 1230, 113 L.Ed.2d 274 (1991) *overturned by statute.*

### A. Presumption Against Extraterritorial Application

There is a canon of statutory construction, a presumption, that "legislation of Congress, unless a contrary intent appears, is meant to apply only within the territorial jurisdiction of the United States." *Foley* at 285. This "canon of construction ... is a valid approach whereby unexpressed congressional intent may be ascertained." *Id.* When applying this canon, the court "assume[s] that Congress legislates against the backdrop of the presumption against extraterritoriality." *Smith v. United States,* 507 U.S. 197, 204, 113 S.Ct. 1178, 122 L.Ed.2d 548 (1993) (citation omitted).

This canon is rooted in considerations of 1) a presumption that Congress is primarily concerned with domestic conditions, *Foley* at 285; and 2) a desire to avoid unintended clashes between our laws and those of other nations which could result in international discord, *Smith,* 507 U.S. at 204 n. 5, 113 S.Ct. 1178 (citation omitted); *McCulloch v. Sociedad Nacional de Marineros de Honduras,* 372 U.S. 10, 20–22, 83 S.Ct. 671, 9 L.Ed.2d 547 (1963). *See also Sale v. Haitian Centers Council, Inc.* 509 U.S. 155, 174, 113 S.Ct. 2549, 125 L.Ed.2d 128 (1993), *citing Smith, supra.*

The court should look to the language of the statute, its legislative history and ad-

ministrative interpretations to determine whether "Congress entertained any intention other than the normal one...." *Foley* at 285. The Supreme Court has applied a standard of "clear evidence of congressional intent" to overcome the presumption. *Smith,* 507 U.S. at 204, 113 S.Ct. 1178. *See also Sale,* 509 U.S. at 176, 113 S.Ct. 2549 (the Court indicated that it would look for "affirmative evidence of intended extraterritorial application ..."); *EEOC,* 111 S.Ct. at 1230 ("unless there is 'the affirmative intention of Congress clearly expressed,' we must presume it 'is primarily concerned with domestic conditions.' ")

### B. Statutory Language

Defendants rely on another rule of statutory construction to argue that the language of the statute is dispositive:

> It is a well settled canon of statutory construction that when interpreting statutes, "[t]he language of the statute is the starting point for interpretation, and it should also be the ending point if the plain meaning of that language is clear." However, if the language in the statute is not clear, courts may resort to the legislative history to ascertain the meaning of the language.

*United States v. Boucha,* 236 F.3d 768, 774 (6th Cir.2001) (citations omitted). However, while this is a valid rule of statutory construction, it has never been so strictly applied in cases concerned with extraterritorial application. Rather, the Supreme Court has engaged in a broader search for indications of Congressional intent, a search which has as a rule encompassed a wide range of materials beyond the plain language of the statute. This is so because, as *Foley, supra,* makes clear, the court's task is to ascertain "unexpressed congressional intent", *supra.*

In the present case, the statute at issue is 20 U.S.C. § 1681, which provides: "**No**

**person in the United States** shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination **under any education program** or activity receiving Federal financial assistance ..." (emphasis added). A list of exceptions to this proscription on discrimination follows. *Id.* § 1681(a)(1–9). Title IX defines "program or activity" as "all of the operations of ... a college, university, or other postsecondary institution, or a public system of higher education...." 20 U.S.C. § 1687(2)(A).

Defendants focus on the words *"no person in the United States"* while Plaintiffs focus on the words *"any education program or activity"*. Defendants assert that the first phrase explicitly demonstrates that Congress meant for Title IX to apply only within the borders of the United States. However, study abroad programs are operations of the University which are explicitly covered by Title IX and which *necessarily* require students to leave U.S. territory in order to pursue their education. Reading the statute as Defendants urge would exempt study abroad programs from the broad scope of Title IX protections mandated by the language of §§ 1681 and 1687(2)(A)—*"any* education program or activity", *"all* of the operations". They would be the only programs or activities so exempt, and would be so wholly by implication.

The specific exemptions to Title IX mandates contained in § 1681(a)(1–9) do not exempt study abroad programs. Nor does § 1687(2)(A) contain any exemption for study abroad programs. Indeed, § 1687(2)(A) contains no exemptions at all, for any programs, and contains broad language similar to that in § 1681, i.e. *"all* of the operations of ... a ... university...."

Title IX is remedial legislation with a broad purpose stated in "two principal objectives ...: '[T]o avoid the use of federal resources to support discriminatory prac-

tices.' and 'to provide individual citizens effective protection against those practices.'" *Gebser v. Lago Vista Independent School District*, 524 U.S. 274, 286–290, 118 S.Ct. 1989, 141 L.Ed.2d 277 (1998) (citation omitted). *See also Grove City College v. Bell*, 465 U.S. 555, 583, 104 S.Ct. 1211, 79 L.Ed.2d 516 (1984) (Brennan, J. DISSENTING OPINION), *superseded by statute*. Remedial statutes are to be read broadly so as to effectuate their purposes. *Tcherepnin v. Knight*, 389 U.S. 332, 336, 88 S.Ct. 548, 19 L.Ed.2d 564 (1967). "In construing a statute, especially a remedial one which must be construed broadly to effectuate its purpose, '[t]he word "any" is generally used in the sense of "all" or "every" and its meaning is most comprehensive.'" *Niece v. Fitzner*, 941 F.Supp. 1497, 1506 (E.D.Mich.1996) (citations omitted).

Thus, Title IX in broad language, not limited by any exception for study abroad programs, sweeps within its scope every single university education program. The encompassing language of sections §§ 1681 and 1687 shows that Congress' intent was to ensure that *every* educational program should come within Title IX's protections against discrimination. This is supported by a reading of the legislative history, which makes clear that "all" is meant comprehensively and that there are to be no implied exceptions to the statutory protections.

### C. *Legislative History*

The legislative history of Title IX consists of congressional statements in floor debate, such as those of Senator Birch Bayh (D–IN), the chief sponsor of the amendment. The Supreme Court has stated that "Senator Bayh's remarks, as those of the sponsor of the language ultimately enacted, are an authoritative guide of the statute's construction." *North Ha-*

*ven Bd. of Educ. v. Bell,* 456 U.S. 512, 526–7, 102 S.Ct. 1912, 72 L.Ed.2d 299 (1982).

In the Senate debates, discussion of the phrase "no person in the United States" is limited to the acknowledgment that it is virtually identical to the language of Title VI of the 1964 Civil Rights Act and its enforcement will be similar. 117 *Cong. Rec.* 30404, 118 *Cong.Rec.* 5803. The only other statement of Senator Bayh relevant to this phrase is that Title IX is meant to apply to "American women." *Id.* at 5804.

Discussion of the phrase "education program or activity" is more detailed. In response to a question about the phrase's meaning, Senator Bayh responded that it was meant "to provide equal access for women and men students to the educational process and the extracurricular activities in a school." 117 *Cong.Rec.* 30407.

The bulk of Senator Bayh's statements regarding Title IX described the need for and purpose of the legislation. For example, Senator Bayh described it as an "antidote" to sex discrimination in education. 118 *Cong.Rec.* at 5803. He called it a "strong and comprehensive measure"; its impact was expected to be "broad" and "far-reaching". *Id.* at 5804–08. Bayh also claimed Title IX would ". . . root out, as thoroughly as possible at the present time, the social evil of sex discrimination in education" *Id.* at 5804.

Bayh also described Title IX as protecting against three types of discrimination, "discrimination in admission to an institution, discrimination of available services or studies within an institution once students are admitted, and discrimination in employment within an institution as a member of a faculty . . ." He stated unequivocally that any exceptions to Title IX's protections would be limited. *Id.* at 5812. Importantly, he stated, "In the area of services, once a student is accepted within an institution, *we permit no exceptions.*" *Id.* at 5812 (emphasis added).

According to Bayh, the drafters of Title IX intended it to have few exceptions and any exceptions were understood to be enumerated in the statutory language.

These statements demonstrate that the sponsors of the bill expected that the language "any education program or activity" would be interpreted broadly to give it full and far reaching effect. Congress did not intend for there to be any exceptions in the area of services to students, meaning no exceptions for particular programs or activities *except as* enumerated in the statute itself.

Furthermore, Senator Bayh also stated that interpretation of "any program or activity" and other provisions would be deferred to the Secretary of Health, Education, and Welfare, who would have complete rulemaking authority. *Id.* Thus, the discussion now turns to those rules and administrative interpretations.

### D. *Administrative Interpretations*

Title IX expressly authorizes administrative agencies to enforce the requirements of Title IX "by issuing rules, regulations, or orders of general applicability which shall be consistent with achievement of the objectives of the statute. . . ." 20 U.S.C. § 1682. Further, "[i]t is well settled that, where, as here, Congress has expressly delegated to an agency the power to 'elucidate a specific provision of a statute by regulation,' the resulting regulations should be accorded 'controlling weight unless they are arbitrary, capricious, or manifestly contrary to the statute.'" *Cohen v. Brown University,* 101 F.3d 155, 173 (1st Cir.1996). Thus, the regulations enforcing Title IX are entitled to controlling weight and policy interpretations issued by the enacting authority, i.e. the Office for Civil Rights, interpreting such regulations are entitled to substantial deference. *Id.*

### 1. *Code of Federal Regulations*

The implementing regulations for Title IX are also broad in scope. 34 C.F.R. § 106 *et seq.*[3] The regulations provide that Title IX was "designed to eliminate (with certain exceptions) discrimination on the basis of sex in *any education program or activity* receiving Federal financial assistance." 34 C.F.R. § 106.1 (emphasis added). The regulations further prohibit discrimination on the basis of sex in "*any* academic, extracurricular, research, occupational training, or other education program or activity operated by a recipient which receives Federal financial assistance." § 106.31(a) (emphasis added). Thus, as does Title IX itself, the regulations sweep within the scope of Title IX protections every single program operated by a university. The regulations do not require that a student be physically located in the United States to receive Title IX protections.

Further, the regulations provide that participation in foreign aid programs will not exempt a university from Title IX's prohibitions on discrimination. 34 C.F.R. § 106.31(c). That is, a university may "administer ... scholarships, fellowships, or other awards" established by foreign funding sources, which are "restricted to members of one sex [and] are designed to provide opportunities to study abroad...." *Id.* But a university may participate in those sex restricted programs *only* so long as it also "provides, or otherwise makes available reasonable opportunities for similar studies for members of the other sex." *Id.* This is evidence that Title IX sweeps within its scope study abroad and foreign scholarship programs, and specifically does *not* allow such programs

to be impliedly read out of the broad language of §§ 1681 and 1687(2)(A).

### 2. *Federal Register*

Additionally, the Department of Education Office for Civil Rights has promulgated extensive guidelines on sexual harassment and enforcement of Title IX.[4] As to the scope of Title IX, the guidelines state: "Title IX protects students in connection with *all* the academic, educational, extra-curricular, athletic, and other programs of the school, whether they take place in the facilities of the school, on a school bus, at a class or training program sponsored by the school at another location, or elsewhere." *Revised Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties.* 65 Fed.Reg. 66092, 66099 (2000) (emphasis added). This broad language mirrors the language of the statute and it is implementing regulations.

In summation, the broad language of Title IX itself, including the limited number of exceptions to Title IX's broad reach; the legislative history, including Senator Bayh's statements as to the broad application of Title IX and limited exceptions thereto; and the implementing regulations, which are to be given "controlling weight", *supra,* and which mirror and expand the broad scope of Title IX's language, provide affirmative evidence that Congress intended for Title IX to apply to every single program of a university or college, including study abroad programs. This is sufficient affirmative evidence that Congress intended extraterritorial application of Title IX where so required, i.e. where the education program or activity

---

**3.** The regulations were first promulgated in 1975 by the Department of Health, Education and Welfare.

**4.** Enforcement of Title IX was transferred from the Department of Health, Education and Welfare to the Department of Education, Office for Civil Rights.

makes it necessary for a student to leave the territorial limits of the United States in order to avail him or herself of the educational opportunities offered. Such educational opportunities should be equally open to participation, regardless of sex.

Equality of opportunity in study abroad programs, unquestionably mandated by Title IX, requires extraterritorial application of Title IX. Holding otherwise could clearly create discrimination within the United States. That is, allowing sex discrimination to occur unremedied in study abroad programs could close those educational opportunities to female students by requiring them to submit to sexual harassment in order to participate. This is exactly the situation that Title IX was meant to remedy: female students should not have to submit to sexual harassment as the price of educational opportunity.

E. *In the United States*

 Even were the court were to read the words "persons in the United States" to impose an extraterritorial limitation, Plaintiffs are persons in the United States who have allegedly been denied the benefits of an education at EMU. Plaintiffs here have alleged hostile environment sexual harassment. In *Davis v. Monroe County Bd. of Ed.* 526 U.S. 629, 631, 119 S.Ct. 1661, 143 L.Ed.2d 839 (1999), the Court held that to state a claim for sexual harassment, a "plaintiff must show harassment that is so severe, pervasive, and objectively offensive, and that so undermines and detracts from the victims' educational experience, that the victims are effectively *denied equal access to an institution's resources and opportunities.*" Sexual harassment which is sufficiently severe and pervasive creates a denial of equal access to institutional resources and opportunities as a whole, as an entire institution, not just within a particular class, activity or program. Such harassment, if proven,

undermines Plaintiffs' education at EMU as a whole, and such detriment can not be confined to the limits of any one class, program or activity.

As continuing students at EMU, Plaintiffs were "persons in the United States" when a denial of equal access to EMU's resources, created by EMU's failure to address and stop the actions of McCauley, Frame and Miller, happened. Study abroad programs are an integral part of college education today. A denial of equal opportunity in those programs has ramifications on students' education as a whole and detracts from their overall education. Such detriment, denial of institutional resources and discrimination on the basis of sex, although initiated abroad, clearly happen to students attending universities and colleges in the U.S., that is to persons in the United States. This conclusion is especially fitting here, where the programs were always under the control of Eastern Michigan University in every respect, rather than under the control of any foreign educational facility.

## IV. CONCLUSION

For these reasons, Defendants' motion to dismiss Plaintiffs' Title IX claim of sex discrimination is denied.

IT IS SO ORDERED.